**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| QUAD CITIES WATERKEEPER, | ) | |
| an Illinois not for profit corporation, | ) | |
| and PRAIRIE RIVERS NETWORK, | ) | |
| an Illinois not for profit corporation, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 4:12-cv-4075-SLD-JEH** |
| DAVID G. BALLEGEER, an individual, | ) | |
| BALLEGEER TRUCKING, INC., | ) | |
| an Illinois corporation, BALLEGEER | ) | |
| EXCAVATING, INC., an Illinois | ) | |
| corporation, and FRANCIS BALLEGEER, | ) | |
| an individual, | ) | |
| | ) | |
| **Defendants.** | ) | |

**O R D E R**

Plaintiffs Quad Cities Waterkeeper ("Waterkeeper") and Prairie Rivers Network ("Prairie Rivers") bring this action for declaratory and injunctive relief and civil penalties under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(1). Plaintiffs claim that Defendants David G. Ballegeer, Ballegeer Trucking, Inc., Ballegeer Excavating, Inc., and Francis Ballegeer have violated and continue to violate the Clean Water Act, 33 U.S.C. §§ 1251–1387, by discharging pollutants without a permit issued under the Act. Now before the Court are the parties' cross motions for summary judgment[1] and three related motions. For the following reasons, the Court DENIES Defendants' Motion for Summary Judgment, ECF No. 36, GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment, ECF No. 61, GRANTS Plaintiffs' Motion for Leave to File Excess Pages, ECF No. 81, GRANTS IN

---

[1] Both parties request oral argument in their respective motions for summary judgment. The Court concludes that oral argument is unnecessary and therefore DENIES the parties' request.

PART and DENIES IN PART Plaintiffs' Motion to Strike, ECF No. 84, and DENIES the parties' Joint Motion to Request Status Hearing, ECF No. 87.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Unless otherwise noted, the following facts are drawn from the parties' statements of material facts submitted in compliance with Rule 7.1(D) of the Rules of the United States District Court for the Central District of Illinois.

## I. The Parties and the Areas of the Green River Where CWA Violations Are Alleged to Have Occurred

Waterkeeper, a not-for-profit organization, was incorporated on November 13, 2009, in the State of Illinois. Certificate of Good Standing, ECF No. 83–1. Its purpose is to promote conservation of the Rock River and other bodies of water in the vicinity of the Quad Cities. Waterkeeper Bylaws at Art. 1, §2, ECF No. 73–5. To that end, Waterkeeper monitors and investigates sources of pollution and undertakes litigation to protect and restore these bodies of water. *Id*. Waterkeeper's bylaws specify that it "shall have no members," *id*. at Art. III, §1, but that its governing body "shall be the Board of Directors . . . and all rights which would otherwise rest in the members shall rest in the Board." *Id.*

Prairie Rivers is a not-for-profit corporation organized and existing under the laws of Illinois. Kim Knowles Decl. ¶ 3, ECF No. 66. Founded in 1967, the corporation has more than 800 members who live in Illinois, including in Henry County. *Id*. Prairie Rivers' primary mission "is the protection of the rivers and streams of Illinois and the promotion of the lasting health and beauty of watershed communities." *Id*. at 5. Prairie Rivers' membership is composed of individuals who provide support either by voluntary efforts or financial contributions, although the Board of Directors may add a member who has demonstrated an active commitment to waterway conservation. Prairie Rivers Network Bylaws at Art. III, Sec. 1, ECF No. 73–8.

The members of Waterkeeper and Prairie Rivers boat, fish, recreate in, and otherwise use and enjoy the lower Green River and the Rock River on a regular basis and have specific plans to return to that area in the future.[2] Pls.' Undisputed Material Facts ¶ 6, ECF No. 61.

Prior to filing this lawsuit, Plaintiffs sent statutorily-required notice of intent letters to Defendants, Defendants' registered agents, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the regional Administrator of the EPA, and the Executive Director of the Illinois Environmental Protection Agency ("IEPA") regarding Defendants' alleged violations of the CWA. Parties' Joint Stipulation to Undisputed Material Facts ("JUMF") at ¶ 30, ECF No. 37. Plaintiffs identify six sites along a section of the Green River where they claim Defendants discharged pollutants and engaged in illegal dredging activity.[3] *See* Plaintiffs' Notice of Intent Letters, ECF No. 52.

David Ballegeer is the owner and operator of a trucking and excavation company, Ballegeer Excavating, Inc., which does business as Ballegeer Trucking, Inc. JUMF ¶¶ 1, 2. Francis Ballegeer owns several hundred acres of property that are directly adjacent to the Green River in Henry County, Illinois, *id.* at 3, including property north of the Green River that corresponds to Sites 1–5.[4] The Green River is a water of the United States under the CWA. *Id.* at ¶ 11.

---

[2] Defendants dispute this fact, in part, based on their argument that Plaintiffs fail to meet the standing requirements for organizations suing on behalf of their members. As discussed in Section II. B. i. *infra*, the Court concludes that those people Plaintiffs assert are members do qualify as members for standing purposes. Defendants also argue that Art Norris and John Daggett cannot assert an injury-in-fact because because they only visited the areas of the Green River at issue in order to collect evidence to support this litigation. *See* Defs.' Resp. to Pls.' Mot. Summ. J. 44–48, ECF No. 73. However, as discussed in Section II. B. ii. *infra*, the Court concludes that Plaintiffs' affidavits are sufficient to show that members of Waterkeeper and Prairie Rivers have standing.

[3] Plaintiffs identify this section of the Green River as "starting approximately 3,000 feet upriver from [its] confluence with the Rock River and extending upriver for approximately two (2) miles from this confluence into Henry County, Illinois." Plaintiffs' Notice of Intent Letters at 3, 9.

[4] Francis Ballegeer asserts that he owns both sides of the Green River that correspond to Sites 1–5 as identified in Plaintiffs' notice of intent letters. DSMF ¶ 1, ECF No. 36. Both parties agree that on or about November 24, 2003,

## II.     Alleged Illegal Activity on the Ballegeer Property

At some point after 1985, Francis Ballegeer asked David Ballegeer to bring concrete down to Francis's farm. JUMF at ¶ 3. Francis Ballegeer was aware of and authorized all of the activities that have occurred at Sites 1–5 since 1985 through the present day. *Id.* at ¶ 4. David and Francis Ballegeer have used an excavator to push concrete generated by Ballegeer Excavating, Inc. onto the banks of the Green River, *id.* at ¶¶ 7, 9, into the river channel, Pls.' SMF ¶ 3, ECF No. 61, and onto the river bed and bottom. Pls.' Mot. Summ. J. at 20. This concrete was previously used for driveways, garage floors, housing, and road pavement. JUMF at at ¶¶ 6, 10. Most of the concrete added by the Defendants or their agents on the banks of the Green River below the ordinary high water mark remains there today, with the exception of several large slabs of concrete near Site 5 that were removed by David Ballegeer around March 2012. *Id.* at ¶ 16. Ballegeer Excavating, Inc., its agents, and David Ballegeer did not wait for no- or low-flow conditions on the Green River to discharge concrete and other materials on its banks below the ordinary high water mark. *Id.* at ¶ 23. Rather, Defendants and their agents would add concrete and other materials on the Green River's banks below the ordinary high water mark so long as the river was not flooding. *Id.* at ¶ 24. In the course of their activities at Sites 1–5, Defendants discharged dirt onto the Green River's banks down to the waterline that would be subject to erosion by expected high flows. *Id.* at ¶ 27.

---

the Department of Transportation acquired the property comprising Site 6. *Id.* at ¶ 2. Plaintiffs dispute that Francis Ballegeer owns said property, arguing that Defendants' property-related documents "do not conclusively show that Mr. Ballegeer is the owner of the river, especially given Defendants['] claim that they sold the land where Site 6 is located . . . to the Illinois Department of Transportation." Pls.' Resp. at 10, ECF No. 69. The Court observes that the "hooks" represented in the parties' joint exhibit plat map (the cartographic representations indicating ties between non-contiguous portions of a land parcel) do not extend across the Green River. *See* Joint Exhibit 16 at 10–11, ECF No. 57. Rather the plat map seems to illustrate that, with respect to the areas constituting Sites 1–6, Francis Ballegeer owns certain property north of the Green River and that the State of Illinois owns certain property south of the Green River. However, given the Court's determination to strike Defendants' authoritative affidavit testimony on this subject, *see* Sec. IV. A. ii. *infra*, the Court concludes that whether Francis Ballegeer owns property on both sides of the Green River at the areas corresponding to Sites 1–5 is a disputed material fact.

Defendants did not seek nor did they receive written authorization from the Army Corps of Engineers ("Corps") prior to discharging concrete on the banks of the Green River below the ordinary high water mark. *Id.* at ¶ 17. Defendants did not and do not presently have an individual CWA Section 404 permit for any materials they discharged on the banks of the Green River below the ordinary high water mark. *Id.* at ¶¶ 19, 20. At no time did Defendants ever give pre-construction notification to the Corps regarding any of the activities that are the subject of this litigation. *Id.* at ¶ 20. During his March 7, 2012 on-site inspection, Corps employee Gene Walsh did not view Sites 1–5 from a boat or otherwise from the river, but only viewed the sites from the land. *Id.* at ¶ 32. Defendants have cut protruding rebar from concrete pieces on the banks of the Green River below the ordinary high water mark at the request of the Corps after the filing of Plaintiffs' Complaint. *Id.* at ¶ 29. As set forth in Section III. B. i. *infra*, David Ballegeer removed sand bars from the Green River at Site 3 with an excavator that had a bucket attached to the end of its boom. Defs.' UMF ¶¶ 18, 19. The parties dispute the nature and extent of the sand and other dredging materials which spilled from the bucket.

## DISCUSSION

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants seek judgment on all of Plaintiffs' claims, arguing that Plaintiffs lack standing to bring suit. On the merits, Defendants contend that they are entitled to judgment as to the Third Claim of Plaintiffs' Amended Complaint because their activities did not constitute the discharge of dredging-related pollutants without an authorizing permit. Plaintiffs seek a declaration that they have standing and a determination as to the First and Second Claims of their Amended Complaint that Defendants violated the Clean Water Act by discharging construction waste on the banks of and into the Green River without a permit.

## A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes regarding material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts construe all facts in a light most favorable to the nonmovant, *id.* at 261, and draw all justifiable inferences in favor of the nonmovant in deciding whether genuine issues of material fact exist. *Id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat an otherwise properly supported motion for summary judgment.

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the nonmovant bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the nonmovant's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore summary judgment is inappropriate if, after drawing all reasonable inferences in favor of the nonmovant, genuine doubts remain and a reasonable fact finder could find for the nonmovant. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.

1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989)).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated.  *Matsushita Elec. Indus. Co.*, 475 U.S. 585–87.  Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## II.    PLAINTIFFS' STANDING

### A.    LEGAL STANDARD

The question of standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* Standing is to be determined as of the commencement of suit.  *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992)).  The burden of establishing the required elements of standing lies with the plaintiff.  *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996) citing *Lujan*, 504 U.S. at 561.  To prove standing at the summary judgment stage, a plaintiff may not rest on mere allegations to support standing, but must set forth by affidavit or other evidence specific facts that, if true, establish an injury in fact.  *Lujan*, 504 U.S. at 560–61.

The "irreducible constitutional minimum of standing" contains three requirements. *Lujan*, 504 U.S. at 560.  First, there must be alleged, and ultimately proven, an "injury in fact," which is a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)).  Injury to recreational or aesthetic interests

constitutes a cognizable injury for purposes of standing. *See Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 183 (2000). Second, there must be causation, which is a fairly traceable connection between a plaintiff's injury and the complained of conduct of the defendant. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Third, there must be redressability, which is a likelihood that the requested relief will redress the alleged injury. *See id.* at 45–46.

In this case, Plaintiffs have elected to proceed under a theory of representational, or associational, standing. Pls.' Resp. to Defs.' Mot. Summ. J. n3 23, ECF No. 69. As stated by the Seventh Circuit in *Retired Chicago Police Ass'n*,

> The doctrine of associational standing is an exception to the general prohibition of representational standing. In order to obtain associational standing, an organization must meet the three-prong test set forth in *Hunt v. Washington State Apple Advertising Comm'n*:
>
>> An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit.
>
> 432 U.S. 333, 343 (1977), superseded by statute on other grounds; *see also Sanner* v. *Board of Trade*, 62 F.3d 918, 922 (7th Cir. 1995).

76 F.3d at 862–63. Under the first prong of *Hunt*, the individuals whom Plaintiffs hold out as their members must "possess all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. The *Hunt* Court found the following factors relevant in finding an agency had associational standing even though it was not a traditional voluntary membership organization:

> [The members] alone elect the members of the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests.

*Id.* at 344–45.

## B. ANALYSIS

Defendants' challenge to Plaintiffs' standing focuses on the first requirement set forth by the Supreme Court in *Hunt*. Regarding the second *Hunt* requirement, the interests that Plaintiffs seek to protect are germane to their asserted environmental purpose. Regarding the third *Hunt* requirement, neither the claims asserted by Plaintiffs nor the relief they request require participation of their individual members, since the injunctive relief sought by Plaintiffs, if granted, will inure to the benefit of their members who are actually injured. *See Warth*, 422 U.S. at 515. Accordingly, whether Plaintiffs have standing to pursue their CWA claim against Defendants hinges on: (1) whether the individuals Plaintiffs identify to be their members are, in fact, members of the organizations and, if so, (2) whether the members have suffered an injury-in-fact such that they would otherwise have standing to sue on their own behalf.

### i. Whether the Individuals Identified by Plaintiffs Are Indeed Members of the Organizations

Defendants maintain that Waterkeeper cannot claim to have any members because it was involuntarily dissolved before this suit was filed, Defs.' Mot. Summ. J. 15, and because its bylaws specifically prohibit members. Defs.' Resp. to Pls.' Mot. Summ. J. 43, ECF No. 73. Defendants also argue that Prairie Rivers has not offered any evidence that Art Norris is a member of its organization. *Id*. at 41–42. Plaintiffs respond that Waterkeeper's involuntary dissolution is of no moment because it was properly reinstated,[5] Pls.' Resp. to Defs.' Mot.

---

[5] Norris, in his capacity as the Executive Director for Waterkeeper since 2009, allows that Waterkeeper was involuntarily dissolved because it had failed to file an annual report. Second Norris Decl. ¶ 5, ECF No. 83. Upon learning of this dissolution, Norris submitted the application for Waterkeeper's reinstatement and the Illinois Secretary of State reinstated Waterkeeper retroactive to April 13, 2012, prior to when the Complaint was filed. *Id.* Norris avers that Waterkeeper is now in good standing, citing Waterkeeper's Certificate of Good Standing. *See* Pls.' Ex. A, ECF No. 83–1.

Summ. J. 29–32, and that they have provided specific evidence of Art Norris's and John Daggett's membership with Waterkeeper since at least 2009 and 2010, Pls.' Resp. to Defs.' Mot. Summ. J. at 17, and of Norris's membership with Prairie Rivers since 2010. *Id.*

### 1. Whether Waterkeeper Had the Capacity to Bring Suit

The Court first turns to the effect of Waterkeeper's involuntary dissolution. Although Defendants argue that Waterkeeper lacks standing, the relevant inquiry concerning Waterkeeper's ability to bring suit given its dissolution at the time the complaint was filed is whether Waterkeeper had the *capacity* to bring suit. Lack of standing and lack of capacity to sue are distinct concepts: "standing to sue" examines whether a party has a legally protectable and tangible interest at stake in the litigation, whereas "capacity to sue" concerns a party's legal authority or power to sue or be sued. 4-17 Moore's Federal Practice - Civil § 17.20 (2014). Parties with the legal capacity to sue may not have standing to prosecute a particular action. *See id.*

Section 112.45(d) of the Illinois General Not For Profit Corporation Act, which governs Waterkeeper's capacity to sue in federal court, *see* Fed R. Civ. P. 17(b)(2), provides:

> Upon the filing of the application for reinstatement, the corporate existence for all purposes shall be deemed to have continued without interruption from the date of the issuance of the certificate of dissolution, and the corporation shall stand revived with such powers, duties and obligations as if it had not been dissolved; and all acts and proceedings of its shareholders, members, officers, employees, and agents, acting or purporting to act in that capacity, and which would have been legal and valid but for such dissolution, shall stand ratified and confirmed.

805 ILCS 105/112.45(d). The plain language of the Not for Profit Act's saving provision provides that upon Norris's proper application for Waterkeeper's reinstatement, *see* n.4 *supra*, the entity was revived retroactively to April 13, 2012 "as if it had not been dissolved." Accordingly, the Court concludes that Waterkeeper had the capacity to bring this suit.

The Court also finds persuasive Plaintiffs' alternate theory: that even if the Court were to find that Waterkeeper's corporate existence was not retroactive, it had standing to sue as a voluntary unincorporated association. Under Illinois law, which would govern this alternate analysis, *see* Fed. R. Civ. P. 17(b)(3), it appears that Waterkeeper would qualify as a "voluntary unincorporated association," which is defined as "any organization of 2 or more individuals formed for a common purpose, excluding a partnership or corporation." 805 ILCS 5/2-209.1. As such, Waterkeeper would be entitled to sue and be sued. *See id.*

### 2. Whether Waterkeeper Has Sufficient Indicia of Membership To Have Associational Standing

As indicated above, under the doctrine of associational standing an organization may bring suit on behalf of its members whether or not the organization itself has suffered an injury from the challenged action. *Hunt*, 432 U.S. 342–44. Before undertaking *Hunt*'s tripartite test, this Court must consider the effect of Waterkeeper's bylaws in determining whether its "members" have "all the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. The Supreme Court in *Hunt* held that despite the fact that the state-created grower's commission had no "members . . . in the traditional trade association sense" it had associational standing to bring suit because "[i]n a very real sense . . ., the Commission represents the growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id.* at 345.

Although not addressed in the parties' briefing, the Court finds the following cases to be instructive concerning the indicia of membership analysis. Several district courts to consider the indicia of membership question have concluded that where the relationship between an organization and its members is more akin to a business-consumer relationship, an organization cannot assert associational standing because it does not represent its members' interests. *See,*

*e.g., Group Health Plan, Inc. v. Phillip Morris Inc.*, 86 F. Supp.2d 912, 918 (D. Minn. 2000) (finding that "the relationship between [the HMOs] and their 'members' is most aptly described as that of a business-consumer relationship, which is readily distinguishable from the traditional association-member relationship necessary to support an assertion of associational standing."); *Allstate Ins. Co. v. City of Chicago*, 2003 U.S. Dist. LEXIS 6180, at *10-11 (N.D. Ill. Apr. 10, 2003) (concluding that where plaintiffs did not allow their insureds any input regarding how the businesses were managed or who was in control, and did not otherwise provide a forum for the insureds to express their views or have their interests in a clean environment protected, plaintiffs could not assertion associational standing); *Clonlara, Inc. v. Runkel*, 722 F. Supp. 1442, 1449-51 (D. Mich. 1989) (holding that where a non-profit corporation's alleged members merely purchased a service but did not elect members of the corporation's board, could not serve on the board, and did not finance the corporation's activities such as the costs of litigation, the corporation could not assert associational standing.)

Unlike the organizations in *Allstate*, *Group Health*, and *Clonlara*, Plaintiffs' factual assertions make clear that Waterkeeper's members are not merely customers. Rather, its members have come together to form an organization for their mutual aid and benefit. *Cf. International Union, United Auto., etc. v. Brock*, 477 U.S. 274, 290 (1986) ("[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."). Although Waterkeeper's Board appears to be self-perpetuating[6], its approximately 160 members voluntarily associate with the organization[7] and their financial contributions are intended to

---

[6] Waterkeeper holds annual meetings wherein the Board elects new members. The meetings are open to members. Sec. Norris Decl. at ¶¶ 23, 24.

[7] Norris Decl. at ¶ 56, ECF No. 62.

promote Waterkeeper's mission – including financing the litigation expenses arising from this case. *See* Sec. Supp. Norris Decl. ¶¶ 14, 25. Waterkeeper's purpose of "promot[ing] conservation of . . . bodies of water, and wetlands in the vicinity of the Quad Cities in Illinois and Iowa . . . monitor[ing] the quality of these bodies of water and wetlands . . . [and] undertak[ing] litigation to protect and/or restore these bodies of water and wetlands," Waterkeeper Bylaws at Art. 1, § 2, is germane to the aims of the instant lawsuit. *Compare U.S. Public Interest Research Group v. Bayou Steel, Inc.*, Civ. A. No. 96-0432, slip op. at 5 (E.D. La. Sept. 15, 1997) (holding that an organization could assert associational standing even though corporate charter expressly prohibited members where it provided a means of expressing the collective views of its members and protected their collective interests in environmental issues) *with Hunt,* 432 U.S. at 344 (finding that an association created for purpose of protecting and promoting Washington state apple industry may seek to vindicate its members' commercial interests). In spite of the prohibition against members found in its bylaws, the Court concludes that Waterkeeper provides a means of expressing and protecting its constituents' collective interests. For these reasons, the Court concludes that Waterkeeper has the requisite indicia of membership to assert associational standing for its members.

### 3.      Whether Art Norris is a Member of Prairie Rivers

Defendants argue that Norris's affidavit which asserts his membership in Prairie Rivers since 2010 is conclusory and should be disregarded. *See* Defs.' Resp. at 41. However, the Court agrees with Plaintiffs that the case Defendants cites in support of their argument is distinguishable. In *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878 (7th Cir. 1998), the plaintiff offered an affidavit stating that every time he or another African-American employee complained about a white employee, the employer would not investigate the allegations against

white employees but would take a "scapegoat approach in dealing with employee problems and generally tended to cover up matters." *Id.* at 887. The portions of affidavits that were stricken in *Drake* included inferences and opinions not substantiated by specific facts. In contrast, paragraph four of Norris's affidavit contains no opinion or inference but merely states a fact. His assertion is bolstered by the affidavit of Prairie Rivers' Executive Director Glynnis Collins, who avers "Art Norris is currently a member of Prairie Rivers Network, and he has been a member continuously since February 26, 2010." Glynnis Decl. ¶ 4, ECF No. 82. These affidavits specifically identify Norris as a member of Prairie Rivers and Defendants have offered no evidence to rebut them. Accordingly, the Court concludes that the Norris and Glynnis affidavits sufficiently identify Norris as being a member of Prairie Rivers, and likewise concludes that the Norris and Daggett affidavits[8] sufficiently identify the two men as being members of Waterkeeper – all prior to the filing of the complaint.

### ii. Whether the Individuals Properly Identified as Members by Plaintiffs Have Suffered an Injury-in-Fact

Defendants argue that Plaintiffs' members cannot show an injury-in-fact because their interests are either too generalized, or are premised upon trespassing on Francis Ballegeer's property.[9] Defs.' Mot. Summ. J. 16–21. Plaintiffs argue that their members' injuries to their aesthetic and recreational enjoyment are exactly the type of harms that qualify as injuries-in-fact,

---

[8] Norris Decl. at ¶ 3; Daggett Decl. at ¶ 4, ECF No. 63.

[9] The Court briefly addresses Defendants' additional argument that Plaintiffs' members' visits to the Green River since May 19, 2011 were made "for the express purpose of obtaining evidence to support this litigation." Defs.' Resp. to Pls.' Mot. Summ. J. 46. The Court has reviewed the citations Defendants offer in support of their suggestion and finds them to present an unfairly restrictive view of the record evidence as a whole. Simply because Plaintiffs noticed a harm to a specified area of the Green River on a certain date and returned to investigate this harm does not necessary lead to the conclusion that *all* of Plaintiffs' visits to that area since that time has been geared toward collecting evidence. Given Plaintiffs' affidavit testimony that they have used and intend to continue to use and enjoy the Green River adjacent to the Ballegeer property, *see* Norris Decl. ¶ 58, 59; Daggett Decl. ¶ 29, the Court concludes that Defendants' argument on this point is meritless.

Pls.' Reply at 18–21, and that their members' other asserted injuries are not premised upon illegal acts. *Id.* at 21–28.

### 1. Whether Plaintiffs' Members' Interests Are Too Generalized

In order to satisfy the first *Hunt* prong Plaintiffs must "include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 555 (1996). Notably, the Seventh Circuit does not require that the members suffering injury be named. *Disability Rights Wisconsin*, 522 F.3d 796, 802 (7th Cir. 2008) (the first *Hunt* prong "still allows for the member on whose behalf the suit is filed to remain unnamed by the organization").

Plaintiffs allege that their members reside in the vicinity of the lower Green River, that they use and enjoy the lower Green River, including the section of river adjacent to the Ballegeer property and approximately one mile downstream of the Ballegeer property, and that they are adversely affected by Defendants' illegal activities. Pls.' Mot. Summ. J. ¶ 6. These allegations are supported with the affidavits of two organization members: Norris and Daggett. Both live in the vicinity of the lower Green River. Norris Decl. ¶ 2; Daggett Decl. ¶ 3. Both use the affected portions of the Green River by swimming, fishing, boating, photographing, and observing wildlife. Norris Decl. ¶ 6; Daggett Decl. ¶¶ 5, 6. Both state their concern about the condition of the Green River directly adjacent to the Ballegeer property and approximately one mile downstream, both believe their recreational and aesthetic interests are affected by pollution of those waters, and both intend to return to the portions of the Green River at issue. *See, e.g.,* Norris Decl. ¶¶ 10–14, 28–31, 49–52, 59; Daggett Decl. ¶¶ 7–9, 11–17, 28, 29.

These affidavits are sufficient to allege an injury-in-fact based on Norris's and Daggett's alleged diminution of their aesthetic and recreational interests. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (concluding that plaintiffs adequately alleged injury-in-fact when they averred that they used the affected area and that the aesthetic and recreational values of the area will be lessened to them because of the challenged activity). The affidavits of Norris and Daggett are not mere "general averments" and "conclusory allegations," *id.* at 184; rather, Norris and Daggett assert that Defendants' discharges of concrete and dredged sand, and the affiant members' reasonable concerns about the effects of those discharges, directly affect their recreational and aesthetic interests. Nor do Norris and Daggett allege that they use "unspecified portions of an immense territory." *Id.* at 183. Rather, Plaintiffs have identified a specific area of the Green River where Defendants' alleged illegal activities have harmed their interests.

## 2. Whether Plaintiffs' Members' Interests Are Premised Upon Illegal Acts

Defendants assert that Plaintiffs' members' allegations of aesthetic and recreational harm cannot be injuries-in-fact because they were discovered via illegal acts under Illinois law. Def's Mot. Summ. J. 16. In Defendants' estimation, Francis Ballegeer owns both sides of the Green River corresponding to Sites 1–5 and therefore Plaintiffs could not fish, *id.* at 17–18, boat, *id.* at 18–19, wade, *id.* at 19–20, or have a viable aesthetic injury, *id.* at 20–21, without trespassing on Francis Ballegeer's property. Plaintiffs maintain that their aesthetic injuries are not dependent on being able to view Defendants' concrete dumping and sand dredging activities by boat. Plaintiffs claim that these activities are viewable from the publicly accessible Hennepin Canal Parkway Trail. Pls.' Resp. to Defs.' Mot. Summ. J. 21. Plaintiffs also assert that whether Francis Ballegeer owns both sides of the Green River at the areas corresponding to Sites 1–5 is

immaterial as to their boating activities because the general public has an easement of navigation on the Green River. Pls.' Resp. to Defs.' Mot. Summ. J. 23. Finally, Plaintiffs argue that they have experienced diminished use and enjoyment of the Green River downstream from Defendants' property, and that the Court need not decide the legality of Plaintiffs' members' right to boat on the areas of the Green River Francis Ballegeer claims to own. *Id.* at 22.

As indicated in note 3 *supra*, the Court has concluded that there remains a dispute of material fact concerning whether Francis Ballegeer owns both sides of the Green River corresponding to Sites 1–5. The Court need not consider Defendants' argument that Plaintiffs' members' alleged trespassing negates their ability to assert an injury-in-fact arising from aesthetic and recreational harm. Defendants do not dispute that the geographical area Plaintiffs' members allege that they plan to return to encompasses "both the section of river adjacent to the Ballegeer property, as well as the mile (approximately) of river that is downstream of the Ballegeer property." Pls.' Mot. Summ. J. ¶ 6. However, Defendants *do* dispute that Plaintiffs' members' "are reasonably concerned that the amount of concrete, rebar, asphalt, sediment, and other construction waste discharged by Defendants at Sites 1-5 . . . will have harmful effects on the river habitat and species downstream of Defendants' property." Pls.' Resp. ¶ 25. Defendants maintain that their actions "have not harmed any of Plaintiffs' alleged activities," Defs.' Reply ¶ 25, citing affidavit testimony that indicates fishing has actually improved on the relevant portions of the Green River and that significant dirt, silt, and sediment capable of degrading fish habitat and water quality has been present for years. *Id.*

The Supreme Court has found evidence similar to that of Plaintiffs' sufficient to establish injury-in-fact. In *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000), the Court concluded that the environmental group members established injury-in-fact

where their "reasonable concerns about the effects of [Laidlaw's discharges], directly affected [their] recreational, aesthetic, and economic interests." *Friends of the Earth*, 528 U.S. at 183–84. Similarly, here Plaintiffs' members' statements that their use of the Green River at Sites 1–5 and approximately one mile downstream has been diminished due to their concerns about discharge from a particular source (here, Defendants' discharge from the Ballegeer property) are sufficient to establish injury in fact. Because the Court concludes that a reasonable jury could find Plaintiffs' concerns to be reasonable, the Court DENIES Defendants' Motion for Summary Judgment on the basis that Plaintiffs lack standing.

## III. THE MERITS OF PLAINTIFFS' CWA CLAIMS

### A. LEGAL STANDARD

The CWA prohibits "the discharge of any pollutant" into federally protected waters without a permit from the Corps. 33 U.S.C. §§ 1311(a), 1344(a). "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters[10] from any point source[11]." § 1362(12). The CWA defines "pollutant" broadly to include not only traditional contaminants but also solids such as "dredged spoil, solid waste . . . biological materials, . . . rock, sand . . .." § 1362(6). Although the Corps' regulations do not define "dredged spoil," they define "dredged material" as "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). The Corps defines the discharge of dredged materials to be "any addition of dredged material into, including any redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.2(d)(1).

The CWA authorizes the Secretary of the Army**,** acting through the Corps, to issue general permits for certain activities that the Secretary determines "will cause only minimal

[10] "Navigable waters" are defined as "the waters of the United States, including the territorial seas." § 1362(7).

[11] "Point source" is defined as "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14).

adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Nationwide permits (NWPs) are a type of general permit issued by the Chief of Engineers and are designed to regulate certain activities having minimal effects. 33 C.F.R. § 330.1(b). An activity is authorized under an NWP only if that activity and the permittee satisfy all of the NWP's terms and conditions. 33 C.F.R. § 330.1(c). All NWPs must comply with general terms and conditions, and many NWPs have their own specific conditions. *Snoqualmie Valley Pres. Alliance v. United States Army Corps of Eng'rs*, 683 F.3d 1155, 1161 (9th Cir. 2012). Additionally, activities are also subject to any regional conditions imposed by the local Corps district, *see Altamaha Riverkeeper v. United States Army Corps of Eng'rs*, 309 Fed. Appx. 355, 357 (11th Cir. 2009), and must comply with case specific conditions imposed by states pursuant to CWA Section 401 certification. *See generally* JE 1, ECF No. 39. Activities falling within the scope of an NWP are automatically authorized without any individualized inquiry, although preconstruction notification of the Corps is required in some cases. 33 C.F.R. § 330.1(e).

B.     **ANALYSIS**

i.     **Defendants' Motion for Summary Judgment on Plaintiffs' Third Claim for Relief**

Defendants argue that they are entitled to judgment as to the Third Claim of Plaintiffs' Amended Complaint because their sand dredging activities did not constitute a violation of Section 301(a) of the CWA, Defs.' Mot. Summ. J. at 21–23, and because the removal of material from a waterway is only regulated under Section 10 of the Rivers and Harbors Act and the Green River is not subject to regulation under that Act. *Id.* at 24 –25.

The parties agree that the Green River is a water of the United States under the CWA, JUMF ¶ 11, and that excavators are point sources within the meaning of the CWA, *id.* at ¶ 8.

Nor do the parties dispute that David Ballegeer removed sand bars[12] from the Green River at Site 3 with an excavator[13] that had a bucket attached to the end of its boom. Defs.' UMF ¶¶ 18, 19. Whether the bucket had any holes which allowed for sand to spill from it, thereby relocating the sand to a different area than where it was original located, is an important area of dispute. Defendants maintain that the bucket had no holes and that there was only minimal spillage of sand while David Ballegeer removed sand from the sand bar. David Ballegeer Dep. 66:3-7, 19-24, JE 5, ECF No. 43. Plaintiffs assert that the bucket "contained two rows of about 7-8 slotted holes in the bottom of it that were approximately an inch thick and 4-5 inches in length." White Decl. ¶ 13, ECF No. 71. David Ballegeer's son Josh allowed Jim White to operate the excavator; White avers that every time a bucket of sand was retrieved from the Green River and rotated back toward the riverbanks "[he] saw wet sand and mud splashing down in the River. Water and sand overflowed from the bucket back into the River in the approximately 20 feet between where the bucket exited the water and the banks of the River." *Id.* at ¶ 15. White allows that "Josh Ballegeer was more skilled than I was at operating the excavator and collecting sand, but sand, water and mud still overflowed back into the river the whole way back to the bank from when the bucket came out of the water." *Id.* at ¶ 16. In 2012, White saw the same excavator in the same area (where they had dug sand in 2007) on four separate trips up the Green River. *Id.* at ¶ 19.

Defendants maintain that they did not add a pollutant to the areas of the Green River at issue because any incidental fallback from their excavation activities is not an addition and therefore not regulated, citing *National Mining Ass'n v. United States Army Corps of Eng'rs*, 145

---

[12] Plaintiffs dispute this fact in that they contend Defendants' sand dredging activities resulted in excavation below the natural river bottom. Pls.' Resp. DUMF ¶ 18.

[13] The excavator is frequently referenced in the pleadings as a long stick backhoe but is, in fact, an excavator. *See* David Ballegeer Dep. at 62: 13-17, JE 5, ECF No. 43

F.3d 1399 (D.C. Cir. 1998). However, Plaintiffs assert that Defendants have not met their burden of establishing that the redeposits were incidental fallback because they have not put forth sufficient evidence regarding the nature of the deposits or the location where they fell back into the river. Pls.' Resp. 34–35.

In *National Mining*, the Court held that the Corps had exceeded its authority under section 404 of the CWA by regulating the redeposit of dredged materials that incidentally fall back in the course of dredging operations. The *National Mining* Court explained that "the straightforward statutory term 'addition' cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back." 145 F.3d at 1404. The D.C. District Court later determined that the Corps' usage of volume as a metric in determining what constituted incidental fallback was flawed. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 2007 U.S. Dist. LEXIS 6366, 11-12 (D.D.C. 2007) ("The difference between incidental fallback and redeposit is better understood in terms of two other factors: (1) the time the material is held before being dropped to earth and (2) the distance between the place where the material is collected and the place where it is dropped.")

In drawing all reasonable inferences in favor of Plaintiffs, which at this stage it must do, the Court concludes that ambiguities remain as to the temporal and geographic nature of the sand and other dredging materials which spilled from the bucket. For instance, a reasonable jury could find White's testimony credible regarding the holes in the bucket allowing for wet sand and mud to splash down into the river as it rotated toward the bank. A reasonable jury could then find that the spillage was not merely incidental fallback. To that end, Defendants' argument that only the Rivers and Harbors Act (rather than the CWA) regulates their removal of sandbars,

and that the Green River is not regulable under that statute, is misguided. Defendants allow that "the removal of sand from the Green River would be considered a discharge," Defs.' Mot. Summ. J. at 25, and thus regulable under the CWA, "if Defendants were replacing the dredge material within the water, but the excavation of sand itself is not a discharge." *Id.* However, because a material factual dispute remains as to whether Defendants' excavation resulted in the discharge of material into the Green River that is not incidental fallback, it would be premature for this Court to determine that the CWA does not regulate Defendants' activity with respect to Claim 3. Accordingly, the Court DENIES Defendants' Motion for Summary Judgment on the merits.

      **ii.**      **Plaintiffs' Motion for Summary Judgment on Plaintiffs' First and Second Claims for Relief**

Plaintiffs seek judgment as to their First and Second Claims that Defendants that violated the Clean Water Act by discharging construction waste on the banks of and into the navigable waters of the Green River without a permit in violation of CWA Section 301. Pls.' Mot. Summ. J. at 13–24. The First Claim concerns Defendants' alleged discharge of concrete and other pollutants onto the banks of the Green River below the ordinary high water mark, Compl. ¶ 54, ECF No. 5, while the Second Claim concerns Defendants' alleged discharge of pollutants onto the bed and river bottom of the Green River. *Id.* at ¶ 59. Defendants respond that there exists a genuine issue of material fact as to whether their activities are not authorized under NWP 13 (governing bank stabilization), NWP 3 (governing maintenance), or section 1344(f)(1)(B) (CWA's statutory maintenance exception.)

Defendants admit that they did not have an individual CWA Section 404 permit for any of their discharges. JUMF ¶ 18. Defendants do not dispute that the concrete and rebar they discharged on the banks of the Green River below the ordinary high water mark qualify as

"pollutants" within the meaning of the CWA. JUMF ¶¶ 4–7. Defendants agree that their excavator qualifies as a "point source" under the CWA. *Id.* at ¶¶ 7–9. Defendants admit that the Green River is a water of the United States under the CWA. *Id.* at ¶ 11.

The Court first turns to NWP 13 which is subject to a number of relevant conditions: NWP General Condition 14, NWP 13 specific conditions (a), (b), and (f), the Corps' Regional Condition 1, and Illinois Environmental Protection Agency Conditions 1, 2, and 5.

At this stage, Plaintiffs must identify those portions of the record which they believe demonstrate the absence of a genuine issue of material fact regarding Defendants' noncompliance with at least one condition of NWP 13. The Court concludes that Plaintiffs have met their summary judgment burden; they have indicated that Defendants have failed to meet Illinois Condition 2. NWP 13 Illinois Condition 2 states:

> 2. Asphalt, bituminous material and *concrete with protruding material such as reinforcing bars* or mesh shall not be:
>
> > A. used for backfill;
> > B. placed on shorelines/streambanks; or
> > C. placed in waters of the State.

JE 1 at 8, ECF No. 39; JE 2 at 8, ECF No. 40; (emphasis added). In the parties' Joint Statement of Material Facts, Defendants admitted that they "did not wait for no or low flow conditions on the Green River to discharge concrete and other materials on the banks of the Green River below the ordinary high water mark," ¶ 23 of JUMF, that they "would add concrete and other materials on the banks of the Green River below the ordinary high water mark so long as it was not flooding," *id.* at ¶ 24, and that they "have cut protruding rebar off concrete pieces on the banks of the Green River below the ordinary high water mark at the request of the Corps after the filing of Plaintiffs' Complaint." *Id.* at ¶ 29.

Defendants' failure to satisfy one mandatory condition is enough to disqualify their activities from being covered under NWP 13. 33 C.F.R. § 330.1(c). Even construing all facts in a light most favorable to the Defendants and drawing all reasonable inferences in their favor, the Court can reach no other conclusion than Defendants discharged concrete containing protruding rebar onto the banks of the Green River below the ordinary high water mark. Plaintiffs' Motion for Partial Summary Judgment is GRANTED to the extent that Defendants cannot claim their activities were authorized under NWP 13.

The Court next turns to NWP 3, which is subject to the following relevant conditions: NWP General Condition 12 and Illinois Environmental Protection Agency Conditions 5 and 6. Again, Plaintiffs need only prove that Defendants have not met one mandatory condition underpinning NWP 3 in order for Defendants' reliance on the permit to fail. 33 C.F.R. § 330.1(c). With respect to Illinois Condition 5 (governing procedures to reduce erosion during construction) and NWP General Condition 12 (governing soil erosion and sediment controls), Plaintiffs argue that Defendants "admit they did not undertake any erosion control measures during their discharges of concrete into the Green River." Pls.' Mot. Summ. J. 20. In support of this assertion, Plaintiffs cites certain two disputed factual statements and David Ballegeer's deposition testimony. The Court finds the following passage from David Ballegeer's testimony important in this respect:

> Q: . . . Did you give any instructions to your employees or to your sons about sediment controls when they were putting the concrete in place, keeping sediment out of the river?
> A: Dirt?
> Q: Yes.
> A: Correct.
> Q: And what instructions did you give them?
> A: If there was any dirt, it went over to the inland side or on top, nothing -- dirt was not supposed to go into the river.

> Q: And your testimony is whenever you put concrete down here, it never resulted in any sediment or dirt going in the Rock River[14]?
> A: That was the goal.
> Q: I know it was the goal, but the question is, did it happen?
> A: No, not to my knowledge.
> Q: But you didn't do anything special to prevent it?
> A: No.

David Ballegeer Dep. 94:4–95:1. In reviewing record evidence in a light most favorable to Defendants, the Court cannot conclude that they did not undertake *any* soil erosion and sediment control measures. Illinois Condition 5 and NWP General Condition 12 both require appropriate measures to be taken to reduce erosion during construction, but although Illinois Condition 5 gives examples of what these interim measures might be, it does not require strict adherence to using these measures. It is possible that a reasonable jury could find that David Ballegeer's instructions to keep dirt confined to the inland side or on top of the concrete constituted sufficient erosion control measures.

Illinois Condition 6 specifies "[an] applicant for Nationwide 3 shall implement erosion control measures consistent with the "Illinois Urban Manual." JE 1 at 3, JE 2 at 3. Plaintiffs assert that Defendants were unfamiliar with the Illinois Urban Manual and that they did not use any erosion control measures in compliance with the Manual. Pls.' Mot. Summ. J. at 21. Defendants offer no rebuttal on this point other than to argue that the concrete they placed on the banks of the Green River *was* the erosion control, Defs.' Resp. to PSF ¶ 25, but of course this does not address whether Defendants knew of and implemented erosion control measures consistent with the Illinois Urban Manual. To that end, David Ballegeer testified at his deposition that he was not familiar with the Manual. David Ballegeer Dep. 98:24–99:1. Accordingly, the Court concludes that even when viewing the record evidence in a light most

---

[14] The Court notes that although counsel questioned David Ballegeer about sediment entering the Rock River, a comprehensive reading of the exchange clearly shows that David Ballegeer was being questioned about the areas of the Green River adjacent to Sites 1–5. *See* David Ballegeer Dep. 91:16–92:17.

favorable to Defendants, Plaintiffs have properly supported their motion with evidence establishing that Defendants did not adhere to Illinois Condition 6. As such, Plaintiffs' Motion for Summary Judgment is GRANTED to the extent that Defendants' activities are not authorized under NWP 3.

Finally, the Court turns to the CWA's section 1344(f)(1)(B) maintenance exception. Section 1344(f)(1) provides an exemption from the permit process for discharges caused by the maintenance of dikes and states in relevant part:

> (1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material
>
> B) for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;
>
> …
>
> is not prohibited by or otherwise subject to regulation under this section or subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

33 U.S.C. § 1344(f)(1)(B). The Seventh Circuit has held that the exceptions found in this provision are to be narrowly construed. *United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir. 1985). Plaintiffs argue that Defendants' actions could not constitute maintenance under the maintenance exception because, according to the regulation, "maintenance does not include any modification that changes the character, scope, or size of the original fill design . . . ." 33 C.F.R. § 323.4(a)(2). In support of their argument, Plaintiffs cite David Ballegeer's testimony averring that concrete was first added to the shoreline in 1985 and that Defendants have continued to bring concrete there. David Ballegeer Dep. 16:11–17. Plaintiffs offer two expert reports by

Daniel Hunt,[15] wherein he states that 1,608 linear feet of concrete have been added to Site 5 from 2007–2012, Ex. A to Plf's Mot. Summ. J., ECF No. 61-1, and that 634 linear feet of concrete have been added to Sites 1 and 2 from 2007–2012. Ex. B to Plfs.' Mot. Summ. J., ECF No. 61-2. Defendants admit that in the winter of 2012, David Ballegeer added at least 300 feet of concrete and construction waste to Site 5. Pls.' SMF ¶ 14.

As it stands, the Court cannot make a determination as to what the original fill design of the concrete structure was. The Seventh Circuit held that "original fill design refers to the manmade structures that are the subject of the exemption (e. g. dikes, dams, levees)." *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 953 (7th Cir. 2004) (internal citation omitted). Although Plaintiffs assert that the Defendants added thousands of linear yards of concrete to the structure, this assertion only makes it possible – but not certain – that Defendants' alleged "modification . . . changed the character, scope, or size of the original fill design." Without more, and construing the facts in a light most favorable to Defendants, the Court cannot conclude that Defendants' activities are precluded from the CWA's maintenance exception. Plaintiffs' Motion for Summary Judgment is DENIED in this respect.

## IV. PLAINTIFFS' MOTION TO STRIKE

Discovery was originally scheduled to be completed by November 1, 2013. *See* October 31, 2012 Minute Entry for Rule 16 Scheduling Conference. However, the parties filed two motions seeking extensions of the discovery schedule: (1) the first motion requested that expert testimony and expert rebuttal reports be completed by January 1, 2014, Joint Motion to Enlarge Time for Discovery 3–4, ECF No. 22; (2) the second motion requested that the discovery deadline, including Plaintiffs' experts' supplemental reports, be extended to March 1, 2014.

---

[15] Defendants suggest that "Plaintiffs' reliance on Plaintiffs' Exhibit A and Hunt Decl. is misplaced as his analyses are fatally flawed." Dfs' Resp. at 56. However, Defendants' only evidentiary support for this assertion derives from certain paragraphs of the Slowinski Affidavit which the Court has determined shall be stricken. *See* Section IV infra.

Second Joint Motion to Enlarge Time for Discovery 3, ECF No. 31. The Court granted both motions and, as a result, the deadline for the completion of all discovery was March 1, 2014. *See* March 19, 2013 Minute Entry and December 23, 2013 Minute Entry.

Plaintiffs contend that Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment includes expert opinions and legal arguments that were not previously disclosed to Plaintiffs, in violation of Fed. R. Civ. P. 26(a). Plaintiffs argue that the affidavits of Thomas Slowinski and Greg Wolterstorff are untimely and include opinions not originally included in Defendants' original expert report, the V3 Report. Pls.' Mot. to Strike 7–13, ECF No. 84. Plaintiffs claim that the affidavit of Jim Allen is testimony from a previously undisclosed expert. *Id.* at 18–20. As such, Plaintiffs request that the Court to strike the Slowinski, Wolterstorff, and Allen affidavits pursuant to its authority under Fed. R. Civ. P. 37(c). Plaintiffs also ask the Court to strike Defendants' V3 Report, arguing: (1) it is redundant in that it is almost entirely based on the findings made by Corps employee Gene Walsh during his March 7, 2012 inspection of Sites 1–5; (2) it is unreliable because Walsh performed an insufficient inspection of Sites 1–5. *Id.* at 14–17; and (3) it contains numerous improper legal conclusions. *Id.* at 17–18.

Defendants maintain that Plaintiffs cannot claim to be surprised or prejudiced by the opinions expressed in the Slowinski and Wolterstorff affidavits because they "had either been expressed by Defendants or were of a similar sort as Defendants' expert had expressed before (either in the V3 report or within the V3 CEMVR-OD-P-2012-1550 Section 4040 Permit Response to Comments provided to Plaintiffs in July 2013)." Defs.' Resp. to Pls.' Mot. to Strike 3, ECF No. 86. Defendants also argue that whether portions of the V3 Report are based on the Corps' on-site inspection goes to the evidentiary weight of the report and not its admissibility. *See id.* Finally, Defendants contend that Allen is a lay witness because "as an ILDOT employee,

[his] opinions are based on his personal knowledge of ILDOT's property ownership and are not expert or specialized testimony." *Id.* at 4. Defendants argue that Plaintiffs cannot be surprised by Allen's testimony because "the ILDOT's ownership of the property has been known by all parties prior to the commencement of this litigation. If called to testify . . . [Allen] … would testify Plaintiffs communicated with ILDOT on this issue as well." *Id.*

## A. Defendants' Expert Testimony

### i. Slowinski and Wolterstorff Affidavits

A party's obligation to identify its expert witnesses is set out in Federal Rule of Civil Procedure 26(a)(2). Under Rule 26(a)(2)(A) "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." There is no question that the testimony Defendants seeks to elicit from Slowinski and Wolterstorff fall within the scope of these rules of evidence. The purpose of the disclosure requirements is to guard against prejudice to the opposing party. "Formal disclosure of experts is not pointless. Knowing the identity of the opponent's expert witnesses allows a party to properly prepare for trial." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004). "Without proper disclosures, a party may miss its opportunity to disqualify the expert, retain rebuttal experts, or hold depositions for an expert not required to provide a report." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (internal quotation marks and citations omitted).

As indicated above, Defendants argue that the affidavits of Slowinski and Wolterstorff are proper as they are limited to matters that "had either been expressed by Defendants or were of a similar sort as Defendants' expert had expressed before." Defs.' Resp. at 3. The Court disagrees with respect to paragraph 4 of Slowinski's affidavit which states "I have reviewed the

Expert Reports/GIS Analyses dated June 29, 2013 and February 17, 2014 ("Hunt Reports") of Mr. Daniel Hunt and offer the following rebuttal to Mr. Hunt's opinions . . . ." Slowinski Aff. ¶ 4, ECF No. 77. Even if Slowinski's opinions were proper rebuttal of the Hunt Reports, they were clearly submitted outside of the discovery deadline. Similarly, Plaintiffs argue that Wolterstorff's affidavit expresses rebuttal opinions in paragraph 3, subparagraphs (c)–(f). The Court finds that these subparagraphs inappropriately contain many new facts and are not limited to responding to the issues raised by the opposing parties' expert.

The Court is mindful that motions to strike are generally disfavored. *See Heller Fin., Inc. v. Midwhey Powder Co*., 883 F.2d 1286, 1294 (7th Cir. 1989). However, Defendants offer no substantial justification for their failure to timely submit this rebuttal evidence prior to the discovery deadline, nor do they explain how their failure was "harmless" to Plaintiffs. Fed. R. Civ. P. 37(c)(1). Accordingly, the Court GRANTS Plaintiffs' Motion to Strike to the following extent: paragraph 4 of Slowinski's affidavit will be stricken, and paragraph 3, subparagraphs (c)–(f) of Wolterstorff's affidavit will be stricken.

### ii. Allen Affidavit

Allen's Affidavit must be stricken for untimeliness. First, the Court finds that Allen's affidavit consists of expert testimony. Allen avers that he based his opinions on his experience as Land Acquisitions Manager for the Illinois Department of Transportation ("IDOT") wherein he regularly reviews warranty deeds, plat maps, and other documents "describing the metes and bounds of real property," Allen Aff. ¶ 4, ECF No. 75, his personal knowledge of IDOT policies and procedures, *id.* at ¶ 5, and his review of parties' Joint Exhibit 17 which includes a plat map and legal description of the Ballegeer property. *Id.* at ¶¶ 6, 7. The opinions expressed in Allen's affidavit fall outside the boundaries of lay opinion testimony. A layperson lacking knowledge of

how to interpret plat maps and how to discern the legal descriptions of land could not arrive at such complicated determinations as Allen made in his affidavit. To admit Allen's analysis as lay opinion testimony would circumvent the restrictions on expert testimony set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 701 advisory committee's note (Rule 701 designed to prevent avoidance of Rule 702's reliability requirements by "proffering an expert in lay witness clothing"). Fed. R. Evid. 701 advisory committee's note. Second, Defendants did not disclose Allen as an expert before the discovery deadline. They offer no substantial justification for their failure to do so, nor do they explain how their failure was "harmless" to Plaintiffs. Fed. R. Civ. P. 37(c)(1).

Accordingly, the Court GRANTS Plaintiffs' Motion to Strike in that paragraph 4 of Slowinski's affidavit, paragraph 3, subparagraphs (c)–(f) of Wolterstorff's affidavit, and the entirety of Allen's affidavit shall be stricken. The Court did not consider any of Defendants' responses to Plaintiffs' statements of fact that relied on the aforementioned.

## B.     Defendants' V3 Report

The Court will briefly address Plaintiffs' argument that Defendants' V3 Report, ECF No. 73–1, should be stricken because it lacks a proper basis. Plaintiffs primarily argue that the V3 Report "relies significantly, if not entirely, on Corps' employee Gene Walsh's March 7, 2012 onsite inspection on behalf of the Corps and Corps' employee Donna Jones's March 9, 2012 letter." *Id.* at 14. This reliance is problematic for two reasons: first, the underlying basis is unreliable; and second, the V3 Report is redundant and does not assist the trier of fact pursuant to Federal Rule of Evidence 702(a). Pls.' Mot. to Strike, 13–17.

The fact that the V3 Report may reflect mistaken assumptions goes to the weight accorded to it, not to its admissibility. Any experts relying on the report are subject to cross

31

examination on this point. *See Dwyer Instruments, Inc. v. Sensocon, Inc.*, 2012 U.S. Dist. LEXIS 21308 (N.D. Ind. Feb. 21, 2012); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 956 (N.D. Ill. 2009). Moreover, the Court is mindful that its "role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. Miss. 1996). Accordingly, the Court concludes that the weight and persuasiveness of the V3 Report will be better tested and assessed at trial rather than on motion practice.

## CONCLUSION

For the aforementioned reasons, the Court DENIES Defendants' Motion for Summary Judgment, ECF No. 36, GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment, ECF No. 61, GRANTS Plaintiffs' Motion for Leave to File Excess Pages and GRANTS IN PART and DENIES IN PART Plaintiffs' Motion to Strike, ECF No. 84. All three claims of Plaintiffs' Amended Complaint remain. However, Defendants cannot claim their activities were authorized under NWPs 13 or 3. The Clerk of Court is DIRECTED to strike in paragraph 4 of Slowinski's affidavit, paragraph 3 subparagraphs (c)–(f) of Wolterstorff's affidavit, and the entirety of Allen's affidavit. As a result of these rulings, the Court DENIES the parties' Joint Motion for Status Hearing, ECF No. 87.


Entered this 26th day of March, 2015.


_____
s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE