**E-FILED**
Friday, 19 February, 2016  02:48:08 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| QUAD CITIES WATERKEEPER, an Illinois not for profit corporation, AND PRAIRIE RIVERS NETWORK, an Illinois not for profit corporation | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No.  4:12-cv-04075-SLD-JEH |
| DAVID G. BALLEGEER, an individual, BALLEGEER TRUCKING, Inc., an Illinois corporation, BALLEGEER EXCAVATING, Inc., an Illinois corporation, AND FRANCIS BALLEGEER, an individual, | ) ) ) ) ) ) | PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT  **Oral Argument Requested** |
| Defendants. | ) ) | |

COME NOW Plaintiffs Quad Cities Waterkeeper and Prairie Rivers Network, through their undersigned counsel, and file this renewed motion for summary judgment pursuant to Local Federal Rule of Civil Procedure 56, Local Rule 7.1(D), and the Court's minute entry issued on January 29, 2016 requiring Plaintiffs to file a renewed motion for summary judgment addressing the permit issue and legality of the levee, and the Clean Water Act's maintenance exemption. Plaintiffs' motion is based on their memorandum in support of their motion, the evidence attached thereto, and any evidence or argument presented at any hearing on this matter.

## TABLE OF CONTENTS

**Page(s)**

Introduction.................................................................................................................1

Undisputed Material Facts .........................................................................................5

Argument ..................................................................................................................11

I.    Defendants' concrete dumping is not eligible for the CWA's maintenance exemption....12

      A.    Only levees constructed before 1972, or levees constructed after 1972 that required and received permits for construction from the Corps, are eligible for the CWA's maintenance exemption.................................................12

      B.    Even if Defendants originally constructed their levee entirely above the OHWM, their concrete dumping activities are still not eligible for the CWA's maintenance exemption ........................................................15

II.    Even if Defendants' levee was eligible for the CWA's maintenance exemption, Defendants' concrete dumping was not "maintenance" ......................................17

III.    Even if Defendants' levee was eligible for the CWA's maintenance exemption, Defendants' concrete dumping was not for the purpose of levee maintenance...............20

IV.    The maintenance exemption does not apply to Defendants' concrete dumping activities because Defendants dumped the concrete on a riverbank, and a riverbank is not a "structure".................................................................................................21

V.    Defendants' dumping of concrete on the bed and bottom of the Green River is not covered by the CWA's maintenance exemption...........................................23

VI.    Plaintiffs' interpretation of the CWA does not render the Act's maintenance exemption a "nugatory;" rather it gives it the meaning Congress intended .....................24

Conclusion ................................................................................................................25

## TABLE OF AUTHORITIES

**Federal Cases**                                                                 **Page(s)**

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983) ...............................11

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................11

*Delgado v. Capital Mgmt. Servs. LP*, No. 4:12-cv-4057-SLD-JAG,
    2013 WL 1194708 (C.D. Ill. Mar. 22, 2013) (Darrow, J.) ................................13

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010)......22

*Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934 (7th Cir. 2004) ......................................... *passim*

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................................13

*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994)....................................................15

*United States v. Brink*, 795 F. Supp. 2d 565 (S.D. Tex. 2011) ......................................11

*United States v. Moses*, No. CR-05-061-E-BLW,
    2006 WL 1459836 (D. Idaho May 25, 2006) ......................................................13

*United States v. Moses*, 496 F.3d 984 (9th Cir. 2007)............................................14, 22

*United States v. Zanger*, 767 F. Supp. 1030 (N.D. Cal. 1991) ................................22, 23

**Federal Law**                                                                     **Page(s)**

33 U.S.C. § 1251(a) ..........................................................................14

33 U.S.C. § 1344(f)(1)(B)....................................................................11, 22

**Federal Regulations**                                                             **Page(s)**

33 C.F.R. § 323.4(a)(2)......................................................................17

33 C.F.R. § 330.1(b) ........................................................................24

**Other**                                                                           **Page(s)**

ARMY CORPS OF ENGINEERS, EMERGENCY EMPLOYMENT OF ARMY
AND OTHER RESOURCES CIVIL MANAGEMENT PROGRAM, ENGINEERING
REGULATION 500-1-1 (2001) ........................................................12, 16

## INTRODUCTION

In this renewed summary judgment motion, Plaintiffs ask this Court to find that the Clean Water Act ("CWA" or "the Act") exemption for the maintenance of currently serviceable structures does not apply to Defendants' concrete dumping on the banks and bed of the Green River. Indeed, as the parties have agreed, this is the only outstanding issue related to liability remaining in this case.[1] Thus, if the Court agrees with Plaintiffs that the exemption does not apply to Defendants' activities, then this Court should grant Plaintiffs summary judgment on their first and second claims for relief.

The CWA's maintenance exemption is a narrow exemption that applies only under certain limited conditions. Defendants bear the burden of proving that their levee is eligible for exemption, and that they meet all of the exemption's elements. As an initial matter, to meet their burden of proving that their discharges of concrete waste are exempt from CWA liability under the maintenance exemption, Defendants must prove that their levee was constructed prior to 1972, or received a permit from the U.S. Army Corps of Engineers ("Corps") if it was constructed after 1972. Because Defendants have stipulated that the levee was built after 1972 and that they did not have a permit for it, the Court's inquiry can end here: the levee is not eligible for the maintenance exemption to the CWA permit requirement.

Defendants may argue that their activities are eligible for the maintenance exemption because their levee was originally constructed entirely above the ordinary high water mark ("OHWM") and never required a permit in the first place. However, the Corps' Engineering Regulation makes clear that Defendants are mistaken and that only levees constructed within the

---

[1] *See* [Proposed] Pre-Trial Order, Dkt. 119, at 2–4 (parties' "Statement[s] of the Case and Remaining Issues for Trial"). This motion for summary judgment is only for the purpose of establishing liability, and does not address remedies. This Court approved of the parties' agreement to bifurcate the remedy phase of the case.

1

CWA's jurisdiction are eligible for the exemption. The maintenance exemption is a carve-out from the CWA's jurisdiction; it logically cannot apply to activities wholly beyond the CWA's jurisdiction.

However, if this Court finds that Defendants' activities are eligible for coverage under the maintenance exemption, Defendants still must prove that their activities were for the purpose of "maintaining" a "structure." To prove that their activities were "maintenance," they must show that their activities did not include any modification that changed the character, scope, or size of the levee's original fill design. To do so, Defendants must set forth sufficient evidence to establish what the original fill design of the levee was—including its character, scope, and size. Defendants then also will need to prove that their purpose was to maintain an existing levee when they placed concrete along and in the Green River. After making this showing, Defendants must prove that the concrete dumped along the banks of the Green River was no more than reasonably necessary for the proposed maintenance. Finally, Defendants must prove that they are not subject to the Clean Water Act's Recapture Provision, *i.e.,* that their purpose was not to bring any areas of navigable waters into a use to which they were not previously subject and that their activity did not impair the flow or reduce the reach of navigable waters. Ultimately, if Defendants fail to set forth sufficient evidence for any one of these elements of the maintenance affirmative defense, Defendants have not carried their burden, and this Court must grant summary judgment to Plaintiffs and find Defendants liable for violating the CWA.

But Defendants cannot meet this burden as a matter of law, which is why summary judgment disposition is appropriate. Defendants' activities were not maintenance because maintenance does not include any modification that changes the character, scope or size of the original fill design. Here, the uncontested facts show that Defendants have significantly changed

2

the character, scope, *and* size of the original fill design of the levee. First, if the levee was in fact constructed entirely above the OHWM, then any discharges below the OHWM necessarily occurred outside of the original fill design. Second, regardless of whatever the original fill design might be, since the levee's construction was completed in 1984, Defendants have expanded the size and scope of the levee, and changed the character of the levee by altering the material of the levee from earth to concrete and other construction debris. As such, Defendants' activities were and are not maintenance and cannot qualify for the exemption.

Additionally, Defendants cannot prove that their activities were for the purpose of maintaining a levee, because as both the Corps and Defendants have stated, the purpose of Defendants' activities was bank stabilization, which is not included within the CWA's maintenance exemption.

Similarly, Defendants' concrete dumping activities do not qualify for the maintenance exemption because Defendants were not maintaining a man-made structure. Both the Corps and Defendants have stated that the purpose of Defendants' dumping was to stabilize the riverbank and protect it from eroding. Because riverbanks are not "structures," the exemption does not apply to Defendants' activities.[2]

Moreover, regardless of whether Defendants' concrete dumping on the banks of the Green River qualifies for the maintenance exemption, the maintenance exemption is entirely inapplicable to any discharges that occurred on the bed and river bottom of the Green River. This is necessarily the case because Defendants cannot argue that the bed and the river bottom are part

---

[2] While Plaintiffs do not address either of these elements in their brief, Plaintiffs again note that in order to meet their burden of proving that they qualify for the maintenance exemption, Defendants also must establish that their concrete dumping was no more than "reasonably necessary" to maintain the levee, and that their activities are not subject to the CWA's Recapture Provision.

3

of the levee's original fill design. As such, any discharges that occurred on the bed and river bottom are outside of the levee's original fill design and do not qualify for the exemption.

Ultimately, as demonstrated below, under any scenario Defendants' affirmative defense fails. Defendants cannot prove that the levee is eligible for the maintenance exemption in the first place; nor, even if the levee were eligible, can Defendants prove that their concrete dumping activities were "maintenance." Furthermore, this Court can also reach this same conclusion—that Defendants' activities do not qualify for the exemption—by finding that Defendants' activities were for the purpose of stabilizing the riverbank to prevent erosion beneath the levee. Even viewing all facts in favor of Defendants, there are no material factual disputes that prevent this Court from concluding that Defendants' activities are not exempt from the Clean Water Act; this Court can make such a determination as a matter of law. As such, this Court should grant Plaintiffs summary judgment on their first and second claims for relief.

### UNDISPUTED MATERIAL FACTS [3]

1.      The levee was not constructed before October 18, 1972. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 4, ¶ 45.

2.      Construction of the levee was not completed before October 18, 1972. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 4, ¶ 46.

3.      Defendants constructed their levee by bulldozing earth to the edge, or near the edge, of the banks of the Green River, to create an earthen levee.

4.      The levee as completed was an earthen berm. *See* Joint Exhibit 5, Dkt. 43, at 16:2, 99: 17–20 (David Ballegeer deposition transcript); *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 4; Joint Exhibit 5, Dkt. 43, at 15:21–25; 16:1–13 (David Ballegeer deposition transcript).

5.      David Ballegeer never received a Clean Water Act permit from the U.S. Army Corps of Engineers to construct the levee. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 4, ¶ 43.

6.      Francis Ballegeer never received a Clean Water Act permit from the U.S. Army Corps of Engineers to construct the levee. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 4, ¶ 44.

7.      The U.S. Army Corps of Engineers never gave David Ballegeer authorization to construct the levee. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 6.

8.      The U.S. Army Corps of Engineers never gave Francis Ballegeer authorization to construct the levee. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 7.

9.      No person ever received a Clean Water Act permit from the U.S. Army Corps of

---

[3] Through this motion, Plaintiffs will cite to their Undisputed Material Facts with the designation "PUMF _."

Engineers to construct the levee.

10.     Defendants' levee was completed in 1984. *See* Joint Exhibit 5, Dkt. 43, at 16:2, 99: 17–20 (David Ballegeer deposition transcript).

11.     Francis Ballegeer does not know the original fill design of the levee. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 8.

12.     Defendants have no documentation related to the original fill design of the levee. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 33.

13.     At the time the levee was finished, there was little or no concrete along the levee or the riverbank.

14.     Sometime in 1985, Francis Ballegeer asked David Ballegeer to start bringing concrete down to Francis Ballegeer's property. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 3.

15.     David Ballegeer began placing concrete on the riverbank in 1985. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 4; Joint Exhibit 5, Dkt. 43, at 15:21–25; 16:1–13 (David Ballegeer deposition transcript).

16.     Francis Ballegeer also added "road slabs" of concrete to the levee after it was initially built. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 3, ¶ 32.

17.     Francis Ballegeer either directly or by directing others caused concrete road slabs to be deposited on the banks of the Green River at the Ballegeer property. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 3, ¶ 33.

18.     Concrete and construction waste generated by Ballegeer Excavating, Inc., including concrete, asphalt, and rebar, has been disposed of on the banks of the Green River and into the river channel. *See* Plaintiffs' Motion for Partial Summary Judgment, Dkt. 61, at 3

6

(Undisputed Material Fact 3); Defendants' Response to Plaintiffs' Partial Motion for Summary Judgment, Dkt. 73, at 9 (not disputing Plaintiffs' material fact 3); Joint Exhibit 5, Dkt. 43, at 44:11–44:23, 22:21—23:14 (David Ballegeer Deposition Transcript); Joint Exhibit 6, Dkt. 44, at 25:5–25:8 (Thomas Slowinski Deposition Transcript); Exhibit D to Plaintiffs' Motion for Partial Summary Judgment, Dkt. 61–6; Exhibit G to Plaintiffs' Motion for Partial Summary Judgment, Dkt. 61–9.

19.     Since the levee was originally constructed, David Ballegeer has added concrete waste to Site 1, as that Site is designated on Plaintiffs' Notice of Intent to Sue. *See* Joint Exhibit 5, Dkt. 43, at 112:5–23 (David Ballegeer deposition transcript).

20.     Since the levee was originally constructed, David Ballegeer has added concrete waste to Site 2, as that Site is designated on Plaintiffs' Notice of Intent to Sue. *See* Joint Exhibit 5, Dkt. 43, at 112:24-25, 113:1-17 (David Ballegeer deposition transcript).

21.     At Site 5, the levee originally was in another location but due to a flood and "blowout," it was moved back away from the Green River. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 5.

22.     Defendants stabilized approximately 500 feet of riverbank approximately 14–19 years ago at Site 1, as that Site is identified in Plaintiffs' Notice Letter. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection).

23.     Between approximately 2009 and 2012, Defendants reinforced 180 feet of bank line with additional brick and concrete rubble at Site 1, as that Site is identified in Plaintiffs' Notice Letter. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection); *see also* Pretrial Order, Dkt. 119, at 11.

24.     Defendants' repaired an additional 50 feet of levee and bank line approximately

twelve to thirteen years ago. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection).

25.     In 2009, Defendants reinforced 80 feet of bank line with additional concrete at Site 2, as that Site is identified in Plaintiffs' Notice Letter. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection).

26.     In 2010, Defendants reinforced 80 feet of bank line with additional concrete at Site 2, as that Site is identified in Plaintiffs' Notice Letter. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection).

27.     In 2011, Defendants reinforced 80 feet of bank line with additional concrete at Site 2, as that Site is identified in Plaintiffs' Notice Letter. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection).

28.     Between 1993 and March 2012, Defendants stabilized approximately 800-900 feet of riverbank between Sites 1 and 2, as those Sites are identified in Plaintiffs' Notice Letter. *See* Joint Exhibit 10, Dkt. 51, at JE 10–1 (March 7, 2012 Report by Gene Walsh of Onsite Inspection).

29.     Since the levee was originally constructed, David Ballegeer has added at least 300 linear feet of concrete and construction waste to Site 5, as that Site is identified in Plaintiffs' Notice Letter. *See* Stipulation of Uncontested Facts and Issues of Law, Dkt. 119-1, at 1, ¶ 10.

30.     In the winter of 2012, Defendant David Ballegeer added at least 300 feet of concrete and construction waste to Site 5, as that site identified in Plaintiffs' Notice Letter. *See* Plaintiffs' Motion for Partial Summary Judgment, Dkt. 61, at 5, ¶ 14 (Undisputed Material Fact 14); Defendants' Response to Plaintiffs' Partial Motion for Summary Judgment, Dkt. 73, at 9 (not disputing Plaintiffs' material fact 14); Joint Exhibit 5, Dkt. 43, at 114:12–116:16 (David

Ballegeer deposition transcript); Joint Exhibit 10, Dkt. 51, at JE 10–2 (March 7, 2012 Report by

Gene Walsh of Onsite Inspection).

31.      Sixteen to nineteen years ago, Defendants placed concrete slabs along 375 feet of

bank line directly upstream of Site 5, as that Site is identified in Plaintiffs' Notice Letter. *See*

Joint Exhibit 10, Dkt. 51, at JE 10–2 (March 7, 2012 Report by Gene Walsh of Onsite

Inspection).

32.      The majority of the concrete added by the Defendants and/or their agents on the

banks of the Green River below the ordinary high water mark remains there today, with the

exception of several large slabs of concrete in the vicinity of Site 5 (as identified in the Notice

Letter) that were removed by David Ballegeer in or around March 2012. *See* Joint Undisputed

Material Facts, Dkt. 37, at 3, Fact 16.

33.      Defendants did not seek nor did they receive written authorization from the Corps

prior to conducting any of the discharges of concrete on the banks of the Green River below the

ordinary high water mark that are the subject of this litigation. *See* Joint Undisputed Material

Facts, Dkt. 37, at 3, Fact 17.

34.      Defendants did not have an individual Clean Water Act Section 404 permit for

any of the discharges of concrete or other materials on the banks of the Green River below the

ordinary high water mark and in the river channel. *See* Joint Undisputed Material Facts, Dkt. 37,

at 3, Fact 18.

35.      Defendants and/or their agents would add concrete and other materials on the

banks of the Green River below the ordinary high water mark so long as it was not flooding. *See*

Joint Undisputed Material Facts, Dkt. 37, at Fact 24.

36.      Defendant Ballegeer Excavating, Inc. and/or its agents and Defendant David

Ballegeer have cut protruding rebar off concrete pieces on the banks of the Green River below the ordinary high water mark at the request of the Corps after the filing of Plaintiffs' Complaint. *See* Joint Undisputed Material Facts, Dkt. 37, at Fact 29.

37.     David Ballegeer pulled concrete out of the river to cut off protruding rebar, because the concrete was too far in the river for him to reach the rebar from the bank. *See* Joint Exhibit 5, Dkt. 43, at 32:6–19 (David Ballegeer deposition transcript).

38.     During the course of Defendants' activities, dirt was discharged onto the river's banks and into the river. *See* [Proposed] Pre-Trial Order, Dkt. 93, at Fact 54.

## ARGUMENT

Defendants bear the burden of proving that their levee is eligible for the CWA's maintenance exemption, and, if so, that they meet all of the exemption's elements. *See Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 949 (7th Cir. 2004); *see also United States v. Brink*, 795 F. Supp. 2d 565, 582 (S.D. Tex. 2011) (noting that when claiming a CWA exemption applies "the burden is on *Defendants* to establish that their activities satisfy the requirements of the exemption") (*citing Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 926 (5th Cir. 1983). Importantly, as this Court recognized, "the party seeking summary judgment on a claim on which the nonmovant bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the nonmovant's case." Order, Dkt. 88, at 6 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). For several reasons, Defendants cannot meet their burden.

First, Defendants have stipulated that the levee they claim to be maintaining was built after the passage of the CWA and without permit authorization from the Corps. Thus, as a matter of law, the concrete discharges Defendants say are related to levee maintenance cannot be eligible for the statutory maintenance exemption.

Second, even if this Court finds Defendants' levee meets the threshold eligibility requirements, Defendants still must prove that the dumping of concrete onto the banks of the Green River was for the "purpose of maintenance … of [a] currently serviceable structure[.]" 33 U.S.C. § 1344(f)(1)(B). But there is no genuine dispute that Defendants' concrete dumping changed the character, scope, and size of the levee, as it existed when it was initially built or even when it was completed in 1984. Thus, Defendants' activities do not qualify as "maintenance" as the Corps explicitly defines that term. Moreover, as a separate but related

point, the purpose of Defendants' concrete dumping was not to maintain a levee, but rather, as Defendants and the Corps have consistently claimed, to stabilize the riverbank. Because riverbanks are not "structures," Defendants' activities likewise do not qualify for the exemption.

This Court can and should reach the same conclusion regarding the statutory maintenance exemption as it did for the Nationwide Permits—that even when the facts are viewed in the light most favorable to Defendants, they simply have not met their burden of proof that the levee is eligible for the exemption and that their concrete dumping activities meet the requirements of the exemption. Accordingly, no defenses remain for Defendants' unpermitted discharges and this Court should grant summary judgment for Plaintiffs on their first and second claims for relief.

## I. Defendants' concrete dumping is not eligible for the CWA's maintenance exemption.

The CWA's maintenance exemption only applies to structures constructed before 1972, or to structures constructed after 1972 that required and received permits for construction from the Corps. Defendants' levee does not fall within either of these categories. Hence, Defendants' activities are not eligible for the exemption, and Defendants' affirmative defense must fail.

### A. Only levees constructed before 1972, or levees constructed after 1972 that required and received permits for construction from the Corps, are eligible for the CWA's maintenance exemption.

That the narrow maintenance exemption in § 404(f) only applies to "grandfathered" structures and those that received CWA permit authorization should come as no surprise. The Corps' Engineering Regulations expressly interpret the exemption in this manner. *See* U.S. ARMY CORPS OF ENGINEERS, EMERGENCY EMPLOYMENT OF ARMY AND OTHER RESOURCES CIVIL MANAGEMENT PROGRAM, ENGINEERING REGULATION 500-1-1 (2001), at 5–15 (noting that the maintenance exemption applies only to "levees constructed before 1972, and to those levees that were constructed since that date, that required and received

12

… [p]ermits for construction").

This Court should give considerable weight to the Corps' interpretation of the maintenance exemption because it reflects the "well-reasoned views" of the agency charged with implementing the CWA in this context. *Delgado v. Capital Mgmt. Servs. LP*, No. 4:12-cv-4057-SLD-JAG, 2013 WL 1194708, at *6 (C.D. Ill. Mar. 22, 2013) (Darrow, J.), *aff'd sub nom. McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014) ("the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance[, and] considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In this case, the Corps' interpretation is contained in a nationally promulgated internal guidance document used to insure consistency amongst the regional subdivisions of the Corps—referred to as an Engineering Regulation—signed by Colonel Robert Crear, then Chief of Staff for the Corps. Because the Corps is entrusted to administer CWA section 404, and the Engineering Regulation constitutes the reasoned national view of the Corps addressing the applicability of the CWA section 404 maintenance exemption to levees, the Corps' Engineering Regulation should be accorded *Skidmore* deference.[4]

At least one court has adopted the Corps' interpretation of the levee maintenance exemption. *See United States v. Moses*, No. CR-05-061-E-BLW, 2006 WL 1459836, at *6 (D. Idaho May 25, 2006), *aff'd* 496 F.3d 984 (9th Cir. 2007) (stating that the regulations

---

[4] Defendants attempt to minimize the significance of the Corps' Engineering Regulation, describing it as only guidance for levees included in the Corps' Rehabilitation and Inspection Program ("RIP"). Def. Tr. Br. at 2. But while the text that Plaintiffs rely on comes from the chapter in the Engineering Regulation discussing the RIP, the Regulation's plain language does not restrict the interpretation to merely levees subject to the RIP, and clearly provides the Corps' general interpretation of the applicability of the CWA's maintenance exemption.

implementing the maintenance exemption assume that the "original fill design" of the structure "was either authorized by permit, or was constructed prior to the permit requirements imposed by the CWA in 1972").[5] As the United States argued on appeal in *Moses*, to hold differently would necessarily mean that "anyone who bulldozes a creek or river to prevent flooding of neighboring lands – and has not been successfully prosecuted for violating the CWA regarding the initial activities – is free to continue such activities, under the exemption for 'maintaining a currently serviceable structure' and is exempt from prosecution in perpetuity." *See* Dkt. 118–2, at 53 n.31, 55 (Brief for Appellee United States in the *Moses* case) (*citing Greenfield Mills*, 361 F.3d at 951). Plaintiffs are aware of no other court that has adopted a conflicting interpretation.

Moreover, the Corps' interpretation is consistent with the purpose of the CWA, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress passed the Act on October 18, 1972, requiring persons adding fill to waters of the United States to obtain a permit if their activities resulted in the discharge of pollutants into such waters. Later, in 1977, when Congress adopted the narrowly-construed maintenance exemption to the CWA's permitting requirements, Congress "grandfathered" pre-existing structures into the maintenance exemption, rather than requiring persons seeking to do maintenance work on structures built prior to the Act's existence to get a permit. However, persons who constructed levees after October 1972 still needed a permit to build their structure if the construction involved work within waters of the United States. Interpreting the exemption to apply only to structures built after the Act's passage that received permits ensures that only structures approved and permitted by the Corps are eligible to take advantage of the exemption,

---

[5] Notably, *Moses* was a criminal case, for which the rule of lenity dictates that any ambiguities are to be construed in favor of defendants. Despite this, the Ninth Circuit had no trouble upholding the district court's determination that the maintenance defense was inapplicable to the defendant's activities in the creek. *U.S. v. Moses*, 496 F.3d 984, 992 (9th Cir. 2007).

14

and ensures that the goal of the CWA is met by ensuring appropriate environmental analysis and protection.[6]

Therefore, this Court should adopt the Corps' interpretation of the exemption and find that the exemption only covers structures that were either (1) built prior to the Act's passage in 1972 or (2) built after 1972 and which were required to have, and in fact received, a permit from the Corps for construction. Defendants' levee does not fall within either of these categories, even when all the facts are viewed in the light most favorable to Defendants. Instead, here, Defendants have stipulated that their levee was not constructed before October 18, 1972, and that they have never received a permit from the Corps to construct their levee. *See* PUMFs 1–2, 5–10, 33–34. Accordingly, the CWA's maintenance exemption does not apply to Defendants' concrete dumping activities as a matter of law, Defendants are liable for their unpermitted discharges as described in Plaintiffs' first and second claims for relief, and Plaintiffs are entitled to summary judgment on their first and second claims.

> **B.** **Even if Defendants originally constructed their levee entirely above the OHWM, their concrete dumping activities are still not eligible for the CWA's maintenance exemption.**

Based on their response to Plaintiffs' trial brief, Plaintiffs expect Defendants to argue that their levee never required a permit when it was originally built because it was constructed entirely above the OHWM of the Green River. *See* Defendants' Response to Plaintiffs' Trial Brief ("Def. Tr. Br."), Dkt. 121, at 2. Thus, according to Defendants, their concrete dumping

---

[6] The requirement to obtain a permit is the primary means by which the CWA's goal to protect the waters of the United States is achieved. *See United States v. Brace*, 41 F.3d 117, 122 (3d Cir. 1994) ("Section 404 of the CWA authorizes the Secretary of the Army, through the [Corps], to issue permits for the discharge of dredged or fill material into the navigable waters at specified disposal sites. The permit program ... is the central enforcement tool of the Clean Water Act.... Unpermitted discharge is the archetypical Clean Water Act violation, and subjects the discharger to strict liability.") (internal citations and quotation marks omitted).

activities are eligible for the maintenance exemption. Defendants are wrong for two reasons.[7]

First, the language Defendants cite from the Engineering Regulation to support their argument, in fact, supports Plaintiffs' argument that Defendants' levee is not eligible for the maintenance exemption in the first place. It appears the parties agree with the Corps that "[t]he requirements for (*and exemptions from*) DA Section 404 Permits apply only to those levees involving work within the waters of the United States[.]" *Id.* (quoting Dkt. 118–1 at 5–15(a)(3)(B)) (emphasis added). Yet Defendants follow this up with the contrary and unsupported assertion that the exemption is "also applicable to those levees which did not involve work within the waters of the United States and which are not located within the waters of the United States." *Id.* Defendants' conclusion is the exact opposite of the Corps' interpretation of the maintenance exemption as reflected in its nationally promulgated Engineering Regulation, and has no support in any agency statement of that exemption, or in any other legal authority.

Second, Plaintiffs do not dispute the core CWA principle that only discharges within waters of the United States require a permit. But it simply does not follow that if the levee did not require a permit when it was built—because it was built entirely above the OHWM— Defendants' subsequent concrete dumping activities *below the ordinary high water mark* are eligible for the maintenance exemption. The Act and its implementing regulations say no such thing, the Corps' interpretation excludes such levees from being eligible for the exemption, and Defendants have not pointed to any authority to support this interpretation. In fact, such an interpretation would turn a narrow exemption from the Act's permitting requirements into an

---

[7] Plaintiffs find it difficult to believe that Defendants did not discharge any pollutants below the OHWM of the Green River when they originally constructed their levee. Defendants built their levee by pushing mounds of dirt up to the edge of the banks of the River. PUMF 3. Even if everyone involved in building the levee were skilled and careful, it is likely that some dirt would have ended up on the banks below the OHWM, or in the river itself. *See, e.g.*, PUMF 38.

expansive carve-out: a person could build a levee after the enactment of the CWA and maintain that levee by performing work below the OHWM of a waterbody and even in a waterbody itself, without ever having to get a permit from the Corps.

To conclude, of course the Corps only has jurisdiction over levees built within their jurisdiction, *i.e., below the ordinary high water mark.* If Defendants' levee was built entirely above the OHWM, than they would not have needed a permit for construction of the levee. But, if that were true, Defendants' levee is not eligible for the maintenance exemption because, as supported by the Corps' interpretation, only levees that were either (1) built prior to the Act's passage in 1972, or (2) built after 1972 and which were required to have, and in fact received, a permit from the Corps for construction, are eligible for the exemption. Because Defendants' activities satisfy neither of these requirements, their levee is not eligible for the exemption and Defendants are left with no viable affirmative defense.

## II.     Even if Defendants' levee was eligible for the CWA's maintenance exemption, Defendants' concrete dumping was not "maintenance."

Even if this Court were to find that structures built after 1972 that did not receive a permit from the Corps are nonetheless potentially eligible for the exemption, Defendants' concrete dumping still does not qualify for the exemption as a matter of law because their dumping was not for the purpose of maintenance. The CWA's implementing regulations make clear that "maintenance does not include any modification that changes the character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2). It is Defendants' burden to prove the character, scope, and size of the original fill design.[8] If they cannot, this Court will have no way

---

[8] While the CWA does not define the term "original fill design," the Seventh Circuit in *Greenfield Mills* found that the term "refers to the manmade structures that are the subject of the exemption (e.g. dikes, dams, levees) rather than a natural watercourse" 361 F.3d at 953. Applying that definition, the *Greenfield Mills* panel found that the defendants' activity in

of determining whether Defendants' activities changed the character, scope, or size of the

original fill design.[9]

Even if Defendants can establish the character, scope, and size of the original fill design,

the undisputed facts show Defendants' concrete dumping changed the character, scope, and size

of the levee's original fill design. First, Defendants may argue that the levee was originally

constructed entirely above the OHWM. But if the levee was originally constructed entirely above

the OHWM, then its original fill design was entirely above the OHWM. If that is the case, then

any subsequent concrete discharges *below* the OHWM occurred outside of the original fill design

and necessarily changed the character, scope, and the size of the original fill design. As such,

Defendants' discharges cannot be considered "maintenance," are not exempt from the CWA, and

required permit authorization from the Corps.

Moreover, regardless of whether Defendants' levee was originally built entirely above the

OHWM, and even when viewing the facts in the light most favorable to Defendants, the

undisputable facts clearly show that Defendants' concrete dumping still does not qualify for the

maintenance exemption because their dumping changed the character, scope, and size of the

levee's original fill design by transforming it from a modest earthen levee to a larger, concrete

levee. It is uncontested that the levee was completed in 1984. PUMF 10. Therefore, whatever the

levee's original fill design was, it was established sometime during or 1984. Starting in 1985,

---

drawing down a supply pond behind a dam did not change the character, scope, or size of the
"original fill design" because it did not affect the only manmade structure at issue, the dam. *Id*.
[9] This Court, in its earlier summary judgment order, found that it could not "make a
determination as to what the original fill design of the concrete structure was" and thus, viewing
the facts in a light most favorable to Defendants, denied Plaintiffs' summary judgment on the
applicability of the maintenance exemption to Defendants' activities. *See* Order, Dkt. 88, at 27. If
Defendants' absence of evidence of the original fill design persists, as Plaintiffs believe it will,
*see* PUMF 11–12, this Court can grant Plaintiffs summary judgment on that basis—that
Defendants have failed to put forth any evidence to support a necessary element of their defense.
*See* Order, Dkt. 88, at 6 (citing *Celotex*, 477 U.S. at 323).

Francis Ballegeer asked David Ballegeer to start bringing concrete down to Francis Ballegeer's property, which David Ballegeer then placed on the riverbank. PUMFs 14–15. Since that time, Defendants have continued to dump concrete, road slabs, asphalt, and other pollutants along the Green River, transforming the levee from its original earthen character to one covered in concrete rubble, asphalt, road slabs, and other construction debris. PUMFs 4, 13, 16–20, 22–32, 37 (statements from Gene Walsh report, David Ballegeer's testimony); Exhibit A at 1–18; *see also* Dkts. 61–6, 61–7, 61–8, 61–9, and 61–10. Defendants have discharged hundreds, if not thousands, of feet of concrete and other pollutants on the banks of the Green River. PUMFs 18–22, 24–34, 35–38. As a result, the levee and concrete riverbank have grown in both size and scope, as the Defendants' concrete discharges have in many places taken over both the riverbank and the earthen berm built on top of the bank. *See* PUMFs 4, 13, 16–20, 22–32, 37; *see also* Exhibit A at 1–18; *see also* Dkts. 61–6, 61–7, 61–8, 61–9, and 61–10. Therefore, because Defendants' discharges changed the character, size, and scope of the levee's original fill design, their discharges are not covered by the CWA's maintenance exemption and Defendants' affirmative defense must fail.

Importantly, while it remains unclear whether the levee was initially constructed above or below the OHWM of the Green River, it does not matter; Defendants are not entitled to the exemption under either scenario. If Defendants contend that their levee was constructed entirely above the OHWM of the river, then any discharges below the OHWM were necessarily made outside of the levee's original fill design and were therefore not for the purpose of "maintaining" the original structure. But if Defendants contend that their levee's original fill design includes the areas both above and below the OHWM of the riverbank, their discharges of concrete changed the character, scope, and size of the original fill design, and thus cannot be classified as

19

"maintenance." Because Defendants cannot meet their burden of proving that they satisfy all of the requirements of the exemption, Plaintiffs are entitled to summary judgment.

III.    **Even if Defendants' levee was eligible for the CWA's maintenance exemption, Defendants' concrete dumping was not for the purpose of levee maintenance.**

Defendants' concrete dumping also does not qualify for the maintenance exemption because if it were for any purpose at all other than disposing of unwanted construction waste, that purpose was bank stabilization, and not levee maintenance.[10] The statute is clear that only discharges *for the purpose of maintenance* qualify for the exemption. 33 U.S.C. § 1344(f)(1)(B). The Seventh Circuit has similarly stated that courts should look to the objective purpose of the discharges, in order to determine whether the maintenance exemption covers a particular activity. *Greenfield Mills,* 361 F.3d at 950.

Here, as reported by the Corps, Defendants have stated that the purpose of their concrete dumping was to stabilize the riverbank and prevent erosion. *See generally* JE 10, Dkt. 51; *see also* JE 13, Dkt. 54, at 4 (Defendants pointing to Corps' employee's report to respond to interrogatory asking about Defendants' bank stabilization work). The Corps repeatedly referred to Defendants' concrete dumping below the OHWM of the riverbank as "bank stabilization" and not "levee maintenance." *See e.g.*, Dkt. 47, at 27:20–28:1 (Corps' employee testifying that he did not consider the "concrete rubble" that Defendants discharged to be levee maintenance or repair work; rather, he considered it "part of the bank stabilization work"). Significantly, since Plaintiffs initiated this lawsuit, Defendants have applied for and received a permit for their similar future bank stabilization work, *i.e. not levee maintenance*, along the bank line of the

---

[10] Plaintiffs do not concede that the purpose of Defendants' dumping was anything other than a simple way to dispose of construction waste. However, for the sake of this argument, Plaintiffs assume, as Defendants and the Corps have repeatedly stated, that the purpose of Defendants' concrete dumping was for bank stabilization.

Green River.[11] *See* Dkt. 108–5, at 1 (Defendants' final CWA section 404 permit).

The fact that the bank stabilization work might help protect the levee does not bring Defendants' bank stabilization activities within the scope of the narrowly-construed maintenance exemption. If the opposite were true—if Defendants' bank stabilization work did qualify for the maintenance exemption because it protects their levee—then any work that could arguably protect a structure could qualify for the exemption, even if that work occurred well outside the structure's original fill design. By not limiting the exemption to work conducted within the original fill design, a once narrow exemption would become an expansive one, allowing the exemption to swallow the rule requiring persons to have permits in the first place. Neither the CWA nor the Seventh Circuit, *see Greenfield Mills*, 361 F.3d at 949–50, support such a broad interpretation, and this Court should reject it.

**IV.    The maintenance exemption does not apply to Defendants' concrete dumping activities because Defendants dumped the concrete on a riverbank, and a riverbank is not a "structure."**

Furthermore, the maintenance exemption also does not apply to Defendants' concrete dumping activities because Defendants dumped the concrete on a riverbank. The CWA is clear that maintenance exemption only applies to the maintenance of structures. Because the discharges that are the subject of this litigation, besides those in the river itself, are discharges on the banks of the Green River, and riverbanks are not "structures," the maintenance exemption does not apply to Defendants' activities.

The CWA gives examples of "structures," listing manmade things including "dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and

---

[11] Of course, if the maintenance exemption did apply to Defendants' concrete dumping onto the bank of the Green River below the OHWM, then Defendants would not have needed to seek, and the Corps would not have issued, a permit for future, similar concrete dumping activities on the banks of the Green River below the OHWM.

transportation structures." 33 U.S.C. § 1344(f)(1)(B). Here, applying the statutory construction canon *noscitur a sociis*,[12] all of these listed items are manmade structures. Notably, and not surprisingly, riverbanks are not included in this list, which makes sense because they are not similar in nature to the items in the list; riverbanks are not manmade.

Case law further supports the conclusion that a riverbank is not a "structure." Plaintiffs are unaware of any case in which a court has found a riverbank to be a "structure." To the contrary, courts have consistently found that only manmade structures fall under this definition. For example, in *Greenfield Mills* the Panel commented that, unlike a dam, "neither the supply pond nor the Fawn River is a man-made 'structure' similar to those listed in the statute." 361 F.3d at 953. Similarly, in *Moses,* the Ninth Circuit stated that the creek at issue could "hardly be called a structure" when the defendant attempted to use the maintenance exemption as a defense for activities modifying the bed and banks of a creek. 496 F.3d at 992; *see also United States v. Zanger*, 767 F. Supp. 1030, 1035 (N.D. Cal. 1991) (finding the maintenance exemption inapplicable as it is limited to the maintenance of structures and there were no structures within the creek in question).[13]

---

[12] The canon of statutory construction *noscitur a sociss* "counsels lawyers reading statutes that 'a word may be known by the company it keeps.'" *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 (2010) (quoting *Russell Motor Car Co. v. United States,* 261 U.S. 514, 519 (1923)).

[13] Defendants will likely attempt to distinguish *Moses* and *Zanger* by arguing that the defendants' activities in those cases were factually dissimilar to Defendants' activities in this case because *Moses* and *Zanger* did not involve alleged levee maintenance. But this argument misses the relevant legal point that the maintenance exemption is only applicable to *man-made* structures. Here, *Moses* and *Zanger* are relevant in that they found natural features, such as riverbanks, were not structures, and that therefore the maintenance exemption was not applicable to any work performed on or in them. *Moses*, 496 F.3d at 992 (noting that the defendant had "made great changes to Teton Creek itself, which can hardly be called a structure anyway[,]" and that "even if some of the log placements within the Creek were, themselves, structures that could be repaired, some of those structures were actually built during 2001, and none of them were

To conclude, Defendants have admitted to dumping concrete and other pollutants on the riverbank. PUMFs 18–22, 24–34, 35–38. As noted earlier, the purpose of the concrete dumping was to prevent erosion of the riverbank, which threatened an existing levee. *See generally* JE 10, Dkt. 51; *see also* JE 13, Dkt. 54, at 4. Work done to protect natural features, such as riverbanks, is not, under any interpretation, worked performed on a manmade "structure." Therefore, Defendants' concrete dumping does not qualify for the maintenance exemption.

## V. Defendants' dumping of concrete on the bed and river bottom of the Green River is not covered by the CWA's maintenance exemption.

Plaintiffs second claim for relief is solely based on Defendants' discharges of concrete and other pollutants on the bed and river bottom. *See* Complaint, Dkt. 5, at 10–11. Defendants have admitted to dumping concrete in the river channel, which necessarily includes the riverbed and bottom, and there are numerous photographs showing such dumping. *See* PUMFs 37–38; *see also* Exhibit A at 17–28.[14] As such, even when the facts are viewed in the light most favorable to Defendants, there is no genuine dispute of material fact regarding whether Defendants discharged concrete and other pollutants onto the Green River bed and river bottom. They plainly did.

Notably, the riverbed and bottom are not part of the levee or within the levee's original fill design or even part of the riverbank. A finding otherwise would mean that a person could dump pollutants into the middle of the river, yards away from the riverbank, and then claim that they did not need a permit for such dumping because the pollutants somehow helped maintain the structure built on top of or adjacent to the bank. Because Defendants' dumping of concrete

---

built pursuant to a permit"); *Zanger*, 767 F. Supp. at 1035 (finding that "[t]here were no structures in the creek when defendants did their filling").

[14] *See also* "An underwater look at concrete dumping on the Green River", https://www.youtube.com/watch?v=UB398Jdxa3M. Defendants waived any challenge to the authenticity of this video. *See* Plaintiffs' Exhibit List, Dkt. 119–4, at 7, item 33.

and other pollutants on the riverbed and bottom was not for the purpose of maintaining their

levee, the maintenance exemption plainly does not apply to these discharges, and Plaintiffs are

entitled to summary judgment on their second claim for relief.

**VI.   Plaintiffs' interpretation of the CWA does not render the Act's "maintenance exemption" a "nugatory;" rather it gives it the meaning Congress intended.**

Contrary to Defendants' assertion, a finding that "the maintenance of a levee cannot

include activities involving an interdependent river bank" would not render the CWA's

maintenance exemption as it pertains to levees a "nugatory." *See* Def. Tr. Br., Dkt. 121, at 3.

Rather, Plaintiffs' interpretation is consistent with Congress's intent and the Seventh Circuit's

explicit instruction that the CWA's maintenance exemption be construed narrowly to apply only

to maintenance *within the original fill design of the structure*. It is illogical to assert that simply

because the exemption does not apply in this situation, it could never apply in other situations.

Moreover, to say that the maintenance exemption does not apply to certain activities is

not to say that a person must obtain an individual CWA permit for those activities. Rather, as this

Court is well aware, the Nationwide Permit system allows routine activities—including certain

bank stabilization activities that do not qualify for the wholesale exemption from the Act—to

proceed and be regulated "with little, if any delay or paperwork." 33 C.F.R. § 330.1(b); *see also*

JE 2, Dkt. 40, at 8–9 (Nationwide Permit 13, for Bank Stabilization). Thus, if a bank stabilization

or maintenance activity that does not qualify for the Act's exemption—say, because it falls

outside the original fill design of the structure—satisfies specified terms and conditions, then a

Nationwide Permit may cover that activity.[15]

---

[15] Notably, as Plaintiffs pointed out in earlier briefings, the fact that there are separate Nationwide Permits for maintenance and bank stabilization further supports the conclusion that the two activities are not the same. *See* Plaintiffs' Consolidated Motion *in Limine*, Dkt. 107, at 15–16. Indeed, Defendants were happy to call their activities "bank stabilization" when they

In short, Defendants' argument is nothing more than a scare tactic. The maintenance exemption applies to work on previously permitted or grandfathered-in levees, that does not change the character, scope, or size of the levee's original fill design. Even weighing all facts and inferences in favor of Defendants, they cannot meet their burden of proving that their levee or any of their discharge activities qualify for the exemption.

## CONCLUSION

Ultimately, Plaintiffs do not disagree with Defendants that "[i]n order to reasonably maintain the river side of a levee, common sense dictates that some incidental and unavoidable maintenance must also occur to the riverbank to which the levee is married." Def. Tr. Br. at 3. Plaintiffs never have argued that Defendants' levee did not need to be maintained. The question for this Court is whether Defendants needed a permit from the Corps for their concrete discharges. Here, where Defendants constructed their levee after 1972 without a permit and, after construction, dumped concrete and other pollutants on the riverbank below the OHWM and onto the river bed and bottom, and where such discharges either changed the character, scope, or size of the levee's original fill design or were for purposes of bank stabilization, the maintenance exemption simply does not apply. As such, this Court should find Defendants' affirmative defense inapplicable as a matter of law and grant Plaintiffs summary judgment on their first and second claims for relief.

DATED this 19th day of February 2016.            s/ Kevin Cassidy
                                                 KEVIN CASSIDY
                                                 LIA COMERFORD
                                                 Earthrise Law Center
                                                 *Attorneys for Plaintiffs*

---

were arguing they fell within the bank stabilization Nationwide Permit 13. Only after this Court ruled Defendants did not qualify for coverage under NWP 13 did Defendants change course and claim *all* of their discharges were exempt as levee maintenance.

4:12-cv-04075-SLD-JEH   # 122   Page 29 of 29

## CERTIFICATE OF SERVICE

I certify that on February 19, 2016, on behalf of Plaintiffs, I electronically filed the

foregoing Plaintiffs' Renewed Motion for Summary Judgment with the Clerk of the Court using

the CM/ECF system, which will send notification of such filing to the following:

Peter Wenker, Jack Brooks, Jeffrey McDaniel, **Attorneys for Defendants**

Albert Ettinger, Kevin Cassidy, **Attorneys for Plaintiffs**


DATED this 19th day of February, 2016          s/ Lia Comerford

                                               Lia Comerford
                                               Oregon State Bar # 141513
                                               Email: comerfordl@lclark.edu
                                               Earthrise Law Center
                                               Lewis & Clark Law School
                                               10015 SW Terwilliger Boulevard
                                               Portland, OR 97219
                                               Tel: 503-768-6823

                                               *Attorney for Plaintiffs*