
E-FILED
Thursday, 29 September, 2016  04:34:56 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| QUAD CITIES WATERKEEPER INC., an Illinois not for profit corporation, and PRAIRIE RIVERS NETWORK, an Illinois not for profit corporation, | ) ) ) ) ) |
| Plaintiffs, | ) Case No. 4:12-cv-4075-SLD-JEH ) ) |
| v. | ) ) |
| DAVID G. BALLEGEER, an individual, BALLEGEER TRUCKING, INC., an Illinois corporation, BALLEGEER EXCAVATING, INC., an Illinois corporation, and FRANCIS BALLEGEER, an individual, | ) ) ) ) ) ) |
| Defendants. | ) |

ORDER

Plaintiffs Quad Cities Waterkeeper ("Waterkeeper") and Prairie Rivers Network ("PRN"), conservation organizations, are suing Defendants David G. Ballegeer, Ballegeer Trucking, Inc., Ballegeer Excavating, Inc., and Francis Ballegeer under the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1).  Before the Court are Plaintiffs' renewed motion for summary judgment, ECF No. 122; Defendants' motion for leave to file excess pages in response to it, ECF No. 123; and Plaintiffs' motion for leave to file excess pages in reply to that, ECF No. 126.  For the following reasons, all the motions are GRANTED.

## BACKGROUND[1]

---

[1] These facts are taken, except where otherwise noted, from Plaintiffs' statement of undisputed material facts, recited in their motion for summary judgment pursuant to Local Rule 7.1(D)(1)(b). Mot. Summ. J. 5–10.  Defendants appear not to have disputed any of these material facts.  *See* Resp. Mot. Summ. J. 10.  They have, however, listed a number of additional material facts, pursuant to Local Rule 7.1(D)(2)(b)(5).  These are cited as "AMF."  Because Plaintiffs' motion is a renewed motion for summary judgment, it does not allege all of the contextual facts the Court relates here.  Where these facts are drawn from the parties' previous joint statement of undisputed material facts, ECF No. 37, the citation is to "JUMF."

1

David Ballegeer owns and operates a trucking and excavation company. JUMF ¶ 1. His brother Francis Ballegeer owns several hundred acres of property adjacent to the Green River in Henry County, Illinois. *Id.* at ¶ 3. At some time prior to 1976, David Ballegeer claims,[2] the previous owner of the property had built a two earthen berms, or levees, on the property "on top of the farm land," AMF ¶ 40, at what the parties identify as Site 4 and Site 5, *id.* at ¶¶ 33–34. *See* Pfs.' Notice of Intent 6, Compl. Ex. A, ECF No. 1-1. However, the levees were not, to the Ballegeers' knowledge, constructed before 1972. Agreed Pretrial Order 4, ¶ 45, ECF No. 119-1. In 1976, the Green River flooded, washing out one of the levees, which the Ballegeers rebuilt. *Id.* at ¶ 35. Beginning in 1980 and continuing until 1984, the Ballegeers constructed a new levee out of earth that spanned the entire riverine length of the property. *Id.* at ¶¶ 48–51. Sometime after 1985, David Ballegeer began bringing concrete generated by his company down to the property. JUMF ¶¶ 4, 6. This waste concrete, previously used for such domestic architecture as driveways, garage floors, and housing, was pushed onto the banks of the Green River to shore up the levees, *id.* at ¶ 7, AMF ¶ 65, 70–71, because over the years, the banks of the Green River had eroded to meet the levees, AMF ¶ 66. The concrete placed there included asphalt and rebar. Over the years, the Ballegeers have added more concrete at various points along the river and levee in response to flooding, adding brick and concrete slabs at several locations, totaling additions of hundreds of linear feet of concrete and other construction waste. Concrete and rebar ended up in the river, as well as dirt resulting from the creation and maintenance of the levee. The Ballegeers assert that their artificial concrete scree, both atop and at the base of the levee,

---

[2] Plaintiffs assert that many of the "additional material facts" raised by Defendants were not identified during the discovery process and are new to Plaintiffs. Mot. Leave Reply ¶ 11. On the basis of the knowledge Plaintiffs had of these assertions at the time of their Reply, however, they do not dispute the listed additional material facts recounted here, but assert instead that they are not material. *See id.*

known as riprap, is structurally necessary to maintain the levee and protect the property from flooding. AMF ¶ 73.

Neither of the Ballegeers ever received authorization from the United States Army Corps of Engineers ("Corps") to create or maintain the levee, or received any kind of permit under the CWA.

Plaintiffs filed this lawsuit on July 19, 2012, alleging, inter alia, in their first two claims for relief, that Defendants had discharged concrete, rebar, dirt, and other pollutants on the banks and bed of the Green River in violation of the CWA. Compl. ¶¶ 53– 62. Both sides moved for summary judgment, ECF Nos. 36, 61, on a number of grounds, most of which are no longer at issue. Relevantly here, Plaintiffs moved for summary judgment on their first two claims for relief, arguing that the placement of concrete and other materials described above was an illegal discharge of a pollutants pursuant to 33 U.S.C. § 1311(a), and that it was not exempted from the statute by any permit. *See* Mar. 26, 2015 Order 22, ECF No. 88. Defendants agreed that the concrete and rebar they had discharged were pollutants within the meaning of the CWA, but argued that it was permitted to discharge these materials nevertheless under the authority of either of two "nationwide permits," or of the CWA's statutory maintenance exception, 33 U.S.C. § 1344(f)(1). *Id.* at 22–23. The Court determined that Defendants' concrete placements were not authorized by either of the nationwide permits, *id.* at 23–26, but declared that it could not determine from the evidence available at that time whether Defendants' placement of concrete could qualify as maintenance of the levee under § 1344(f)(1), and thus be exempted from the CWA's ban on the emission of pollutants. Mar. 26, 2015 Order 27. The Court elaborated that this was so because it was not possible to determine what the "original fill design" of the levee had been, and thus whether the placements of concrete were maintenance of that levee. *Id.*

Based on the Court's ruling, the parties prepared for a trial on this limited question only—whether the otherwise-illegal placements of concrete and other waste materials next to and in the Green River were exempted from the prohibitions of the CWA by the maintenance exception. Agreed Pretrial Order 4–7, ¶¶ 1–14. (Plaintiffs' other remaining claim was voluntarily dismissed. Proposed Pretrial Order 46, ECF No. 93.) However, Plaintiffs argued for the first time in their trial brief that the Corps had promulgated regulations limiting the maintenance exception to maintenance of structures constructed prior to 1972, or to levees that had received construction permits. Pls.' Trial Br. 3–5. They also argued that this limitation was inferable from the language of the maintenance exception itself, and had been recognized by other federal courts. *Id.* In response to the new, potentially dispositive argument, the Court vacated the looming jury trial and ordered another round of summary judgment briefing on the applicability of the maintenance exception. Jan. 29, 2016 Minute Entry. The fruit of this order was borne in the form of the motions currently before the Court.

## DISCUSSION

Plaintiffs seek summary judgment on their two remaining claims, arguing that Defendants' concrete placement is not covered by the CWA's maintenance exception (or any other exception, but the maintenance exception is the only one that remains at issue). Mot. Summ. J. 11, 12–15. Plaintiffs argue that Corps regulations and the language of the maintenance exception itself require the structures maintained under the exception to predate the passage of the CWA in 1972 or have subsequently been permitted. *Id.* Because Defendants concede neither condition is met, Plaintiffs claim the maintenance exception cannot apply. *Id.* In the alternative, Plaintiffs argue that Defendants' cannot show their concrete placements were for the purpose of maintenance of an existing structure, as they must have been under the maintenance

4

exception. *Id.* at 11, 15–24. Defendants respond that the CWA does not require maintained structures to predate 1972 or be permitted, Resp. Mot. Summ. J. 24–32, ECF No. 124, and that their concrete placements were for the purpose of maintaining the levee, without exceeding the scope of its "original fill design." *Id.* at 32–46.

I. **Legal Standard on a Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("The court [at summary judgment] has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.").

The party seeking summary judgment must base its motion on record evidence, Fed. R. Civ. P. 56(c) (listing acceptable kinds of evidence), or at least point out the record's lack of evidence supporting its opponent's claims or defenses on issues where the adverse party bears the ultimate burden of proof, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). To defeat a properly supported motion, the non-moving party must respond with "evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). When evaluating a motion for summary judgment, "the party opposing the motion gets the benefit of all facts that a reasonable jury might

find," *Loudermilk v. Best Pallet Co., Inc.*, 636 F.3d 312, 314 (7th Cir. 2011), as well as the benefit of all inferences a reasonable trier of fact could draw from those facts, *id.* at 315.

### II. The CWA

The CWA prohibits "the discharge of any pollutant" into federally protected waters without a permit from the Corps. 33 U.S.C. §§ 1311(a), 1344(a). "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters[3] from any point source."[4] § 1362(12). The CWA defines "pollutant" broadly to include not only traditional contaminants but also solids such as "dredged spoil, solid waste . . . biological materials, . . . rock, sand . . . ." *Id.* at § 1362(6). The CWA authorizes that Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill materials into navigable waters. *Id.* at § 1344(a). The Corps may proceed via a formal notice and comment process to designate specific disposal sites for the discharge of dredged or fill material, *id.*, but is also authorized to issue via regulation "general permits," for which no application is necessary, and which categorically allow certain discharges of dredged or fill material that have "only minimal adverse environmental effects . . . ." *Id.* at § 1344(e)(1). The promulgation of the permits themselves requires notice and comment, but once issued, activities may fall within the ambit of the permit and be legal without further review or permitting by the Corps. *Id.*; *see also United States v. Hummel*, No. 00 C 5184, 2003 WL 1845365, at *9 (N.D. Ill. Apr. 8, 2003). These permits are commonly referred to as "nationwide permits." *See, e.g.*, *Rueth v. U.S. E.P.A.*, 13 F.3d 227, 228–29 (7th Cir. 1993).

Finally, in the section that immediately follows the section authorizing nationwide permits, the CWA explicitly exempts several kinds of minimal discharges of fill material as

---

[3] "Navigable waters" are defined as "the waters of the United States, including the territorial seas." § 1362(7).

[4] "Point source" is defined as "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14).

6

"non-prohibited," by providing that they shall not be prohibited by § 1311. 33 U.S.C. § 1344(f). These discharges include those for purposes such as "normal farming [and] silviculture," *id.* at § 1344(f)(1)(A), construction and maintenance of stock ponds, *id.* at § 1344(f)(1)(C), creation of "temporary sedimentation basins" on construction sites that do not feed into navigable waters, *id.* at § 1344(f)(1)(D), construction and maintenance of farm roads according to best environmental management practices, *id.* at § 1344(f)(1)(E), and the conduct of State-approved programs that meet the requirements of 33 U.S.C. § 1288(b)(4)(B) and (C), *id.* at § 1344(f)(1)(F).[5] At issue in this case is the so called "maintenance exemption," which exempts discharges of dredged or fill materials "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures . . . ." *Id.* at § 1344(f)(1)(B). All of these exempted discharges are also qualified by a "recapture" provision, which provides that even an otherwise-exempted discharge "having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced[,]" must be permitted.

The exceptions to the permitting regime enunciated in § 1344(f) are to be narrowly construed. *United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir. 1985). The Corps has issued regulations implementing these exceptions, which add, with respect to § 1344(f)(1)(B), that "[m]aintenance does not include any modification that changes the character, scope, or size of

---

[5] Section 1288 governs areawide waste treatment management programs, and in relevant part authorizes States to submit programs for federal approval that, inter alia, are intended to "control the discharge or other placement of dredged or fill material into the navigable waters [of the United States.]" 33 U.S.C. § 1288(b)(4)(B). Such programs must be designed in consultation with the State's fish and wildlife department, according to best management practices, and so as to identify and manage the discharge of dredged or fill material that could adversely affect navigable waters. *Id.*

7

the original fill design," and that "[e]mergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption." 33 C.F.R § 323.4(a)(2). In addition, the Corps has published regulations, although not in the Code of Federal Regulations or the Federal Register, governing the emergency employment of Army resources in its Civil Emergency Management Program. Emergency Employment of Army and Other Resources: CIVIL EMERGENCY MANAGEMENT PROGRAM, Engineering Reg. No. 500-1-1 (U.S. Army Corps of Engineers) (available at http://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_500-1-1.pdf, last visited Sept. 22, 2016) (hereinafter "ER 500-1-1"). These regulations enunciate, in pertinent part, rules for the management of the Corps's Rehabilitation and Inspection Program ("RIP"), which provides for the inspection and, in some cases, rehabilitation of damage to flood control works. ER 500-1-1 at 5-1–5-29. The regulations provide guidance for the Corps on when rehabilitation projects are permissible under environmental law, and include the following passage:

> Section 404(f)(1) of the CWA, as implemented by 33 CFR 323.4(a)(2), specifically exempts routine maintenance of levees (which includes tree cutting and tree root removal) from the requirement to obtain a Department of the Army (DA) Permit, pursuant to Section 404. This exemption is applicable to all levees constructed before 1972, and to those levees that were constructed since that date, that required and received DA Permits for construction. It is assumed that any non-Federal levee that is Active in the RIP has been appropriately investigated and determined to be in compliance with applicable provisions of the CWA, and has received the necessary permits for construction.

ER 500-1-1 at 5-13(3).[6]

### III.   Analysis

The parties find themselves arguing within a peculiar legal and regulatory anfractuosity: can construction on a levee not permitted by the Corps, a levee in violation of the CWA if it falls within the CWA's ambit, nevertheless fall within an exception to the CWA designed to permit

---

[6] "Section [sic] 404(f)(1) of the CWA" is codified at 33 U.S.C. § 1344(f)(1).

maintenance of levees?  The Court admittedly set the parties up for these contortions by ruling in its original order on the motions for summary judgment that none of Defendants' discharges of concrete and other matter were covered by any permit, but could possibly be allowed by the § 1344(f)(1)(B) maintenance exception.  *See* Mar. 26, 2015 Order 27 ("Without more, and construing the facts in a light most favorable to Defendants, the Court cannot conclude that Defendants' activities are precluded from the CWA's maintenance exception.").  It is now Defendants' burden to show that a reasonable jury could find that the maintenance exception applies to the concrete they discharged on the banks of and in the Green River.  *See Carroll*, 698 F.3d at 564.

One logical consequence of the Court's ruling has been that Defendants, to avoid conceding liability on the first two claims for relief, have been forced to argue that the "original" levee is high up enough on the Ballegeer property that it lies outside the waters of the United States, and thus of the CWA's purview, and that all additions of concrete and other materials to this structure, many of which concededly *have* been in the waters of the United States, have been in the nature of "maintenance" to that original levee, as the term is used in § 1344(f)(1)(B).  Resp. Mot. Summ. J. 33–35.  Defendants maintain that this can be so because erosion has caused the river to lap up to the edges of the levee, causing concrete added to shore up that levee to end up in the river.  *See id.* at 35–36 ("[I]n effect, the river has come inland to meet the levee").  So too, in an effort to maintain that the admittedly much-longer levee the Ballegeers built was created by "maintenance" of the original levee, Defendants have been forced to assert, using terms of art from 33 C.F.R § 323.4(a)(2), that no individual addition "change[d] the character of the original fill design" of the levee, Resp. Mot. Summ. J. 36.  The smaller initial levee thus grows into the (at least) 7,600-foot current structure simply by being added to piece by piece.

9

*See id.* at 35.  The Court need not pass on the ship-of-Theseus[7] logic at work here, however, because the Court is persuaded as an initial matter that the § 1344(f)(1)(B) maintenance exception does not cover maintenance of a levee that is itself illegal under the CWA.  A careful reading of the statute compels this result, as does the confirmatory analysis of at least one other district court, and the Corps's own regulations.

By its plain language, § 1344(f)(1)(B) permits maintenance of "currently serviceable structures," non-exhaustively including dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments, and transportation structures.  Defendants urge that their structure is a levee, its maintenance is explicitly permitted, and the analysis should end there.  Resp. Mot. Summ. J. 28–30.  But courts will not read a statute in such a way as to "produce an absurd and unjust result which congress could not have intended." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574 (1982).  Indeed, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Id.* at 575; *see United States v. Head*, 552 F.3d 640, 643 (7th Cir. 2009) ("[W]e can apply the [absurdity] doctrine only when it would have been unthinkable for Congress to have intended the result commanded by the words of the statute—that is, when the result would be so bizarre that Congress could not have intended it . . . ." (quoting *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (en banc) (internal quotation marks omitted))).  Although the "absurdity doctrine" is stringent, it is "unthinkable" that Congress could have intended to exempt from the CWA the maintenance of *any* levee or currently serviceable structure, even one itself built without a CWA permit, but requiring a permit to be legal under the CWA.  As Plaintiffs

---

[7] As related by Plutarch, the ship of Theseus, an Athenian king, was preserved by the Athenians for many years.  When a plank decayed, they would replace it with a new one, until philosophers could not agree whether the ship was the same as or a different vessel than the one Theseus had sailed.  "Ship of Theseus," Wikipedia, https://en.wikipedia.org/wiki/Ship_of_Theseus (last visited Sept. 21, 2016).

argue, were this the case, once someone created a structure in the waters of the United States, no matter how flagrantly that structure violated the CWA, that person could neither be prosecuted criminally under the CWA nor held civilly liable for anything then done to the offending structure that could be termed "maintenance." Mot. Summ. J. 14. To legalize maintenance of an illegal structure—more, to expressly exempt that maintenance from a regulatory regime—is absurd; the far more natural reading of the statute is to infer that the "currently serviceable structures" to which maintenance is permitted must themselves not be in violation of the CWA, and that levees thus maintained must not qualify us pollutants under the CWA and yet fall outside the ambit of one Corps permit or another. Thus, the statute provides that discharge of dredged or fill material for maintenance of a CWA-exempt levee is also itself exempt, but that such discharge for maintenance of a CWA-violative one is not.

This reading of the statute is strengthened by the other § 1344(f) exceptions to the permitting regime, which show a consistent purpose of exempting only minor discharges of dredged or fill material in support of activities that are themselves minimally impactful, and not violative of the CWA. Discharge of sediment in support of "normal" farming and ranching activities is exempted, as is discharge for the construction of stock ponds on farms or of sedimentation basins, but only if the fill material removed from the basins is not placed into navigable waters. 33 U.S.C. § 1344(f)(A), (C), (D). None of the underlying actions listed is in itself violative of the CWA, and in the case of sedimentation basins, even the discharges exempted cannot be placed in navigable waters. Farm or forest roads may be maintained, but both maintenance and construction of the roads themselves must be in accordance with best practices, "to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced,

11

and that any adverse effect on the aquatic environment will be otherwise minimized[.]" *Id.* at § 1344(f)(1)(E). In this case, the statute explicitly requires the maintenance and the construction of the structures themselves to be conducted with extraordinary care to minimize what would otherwise be violations of the CWA. And 33 U.S.C. § 1344(f)(1)(F) exempts State programs that discharge dredged or fill material according to best management practices, and in such a way as to identify and manage the discharge of dredged or fill material that could adversely affect navigable waters. *See* 33 U.S.C. § 1288(b)(4)(B). In other words, each other activity exempted from the CWA's pollution ban relates to the construction or maintenance of structures that by their nature have a minimal impact on navigable waters, or are required by the language of § 1344(f)(1) itself to be carefully designed to minimize their impact on those waters. It is inconsistent with the manifest purpose of these other exemptions from the ban on discharge of fill material to read § 1344(f)(1)(B) as permitting maintenance of structures that are themselves in violation of the CWA.

Furthermore, the Corps's regulations clearly indicate that the Corps interprets the CWA to allow maintenance only of permitted structures. 33 C.F.R. § 323.4(a)(2) provides that the maintenance exception cannot include "any modification that changes the character, scope, or size of the original fill design." As another district court has observed, "[t]his provision assumes that the 'original fill design' was either authorized by permit, or was constructed prior to the permit requirements imposed by the CWA in 1972." *United States v. Moses*, No. CR-05-061-E-BLW, 2006 WL 1459836, at *6 (D. Idaho May 25, 2006), aff'd, 496 F.3d 984 (9th Cir. 2007). The Court agrees that § 323.4(a)(2)'s ban on expansions of the original design of a structure strongly presumes that the structure itself is legal under the CWA, and that expansion or addition to the structure in question would have itself to be authorized by the CWA permitting process.

More explicitly, ER 500-1-1 states plainly that routine maintenance exemption under § 1344(f)(1) is applicable only to levees constructed before 1972, and to levees that have been permitted pursuant to the CWA. ER 500-1-1 at 5-13(3). The regulation also states the commonsense reason for this interpretation: that any levee active in RIP and eligible for maintenance under the program has been examined by the Corps and been appropriately permitted. *Id*. Impliedly, if a levee had been found not to be in compliance with the CWA, there would be no question of maintenance of that levee being appropriate. The regulation further specifies that the maintenance exception applies only to work done within the physical limits of the levee, further bolstering the reasoning of the court in *Moses*. ER 500-1-1 at 5-13(3)(a).

The Corps's regulatory interpretations of statute have not been found themselves to carry the force of law. *See Pearce v. United States*, 261 F.3d 643, 648–49 (6th Cir. 2001) (holding that an Engineering Regulation promulgated by the Corps did not have the force of law because it was interpretive of a statute and not published in the Code of Federal Regulations or Federal Register); *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000) (same). Thus, they are likely not entitled to the extent of deference envisioned by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (holding *Chevron* deference only warranted when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and the agency interpretation claiming deference was promulgated in the exercise of that authority). However, such interpretations by one of the agencies responsible for implementing the CWA should still be accorded considerable weight, because "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Bragdon v. Abbott*, 524 U.S. 624,

13

642 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140 (1944)).  Here, the Corps's Engineering Regulation provides guidance to Corps officials administering a program to help maintain levees about circumstances in which, in the Corps's experienced view, it will not be permissible to maintain a levee.

For all of these reasons, the Court holds that, as a matter of law, the § 1344(f)(1)(B) maintenance exception cannot apply to maintenance of a levee that is itself violative of the CWA, 33 U.S.C. § 1311, because it is an emission of dredged or fill material not covered by a Corps permit.  Thus, Defendants cannot maintain that the concrete and other materials discharged on the banks of the Green River and in the river itself, as alleged in Plaintiffs' first and second claim for relief, are excepted from liability under the CWA by the maintenance exception.  To the extent that the "original" levee, whatever the contours of that entity may have been, did not itself require a permit under the CWA because it was too far from the Green River, Defendants offer no legal support to suggest that the levee would not have required a permit once it, and discharges of concrete to maintain it, fell within the waters of the United States, and the CWA's ban on such emissions.

## CONCLUSION

Accordingly, Plaintiffs' renewed motion for summary judgment, ECF No. 122; Defendants' motion for leave to file excess pages in response to it, ECF No. 123; and Plaintiffs' motion for leave to file excess pages in reply to that, ECF No. 126, are GRANTED. Additionally, the still-pending motions in limine, ECF Nos. 105, 106, 109, 110, and 111 are MOOT.

The parties agreed to a bifurcation of the penalty phase of these proceedings. Accordingly, the Court sets a bench trial to determine remedies for January 10, 2017 at 9:00 a.m.

at the Rock Island courthouse.  Final pretrial conference is set for December 2, 2016 at 1:30 p.m. at the Rock Island courthouse.  Counsel who will actually try the case are to appear at this conference in person.  The agreed proposed final pretrial order is due on November 18, 2016.  This order shall conform in form and content to Local Rule 16.1(F).

    Entered this 29th day of September, 2016.

                                              s/ Sara Darrow
                                              SARA DARROW
                                        UNITED STATES DISTRICT JUDGE