UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| QUAD CITIES WATERKEEPER INC., an Illinois not for profit corporation, and PRAIRIE RIVERS NETWORK, an Illinois not for profit corporation, | ) ) ) ) | |
| | ) | Case No. 4:12-cv-4075-SLD-JEH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DAVID G. BALLEGEER, an individual, BALLEGEER TRUCKING, INC., an Illinois corporation, BALLEGEER EXCAVATING, INC., an Illinois corporation, and FRANCIS BALLEGEER, an individual, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER

      This is a Clean Water Act case, 33 U.S.C. §§ 1251–1387 ("the CWA"). Plaintiff

environmental organizations sued Defendants under the CWA's citizen suit provision, 33 U.S.C.

§ 1365(a)(1). The Court granted summary judgment for Plaintiffs as to liability on September

29, 2016. ECF No. 128. A bench trial followed on January 30, 2017 to determine liability. Jan.

30, 31, and Feb. 1, 2017 Minute Entries. Per the Court's order, the parties have each submitted

proposed findings of fact and conclusions of law. Having considered the arguments and

evidence submitted, the Court makes the following findings of fact and conclusions of law

pursuant to Federal Rules of Civil Procedure 52(a) and 65(d).

**FINDINGS OF FACT[1]**

---

[1] The findings of fact are made in compliance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact is deemed to be a conclusion of law, it is incorporated as such, and to the extent that any conclusion of law is deemed to be a finding of fact, it is incorporated as such.

David Ballegeer owns and operates a trucking and excavation company, Defendant Ballegeer Excavating, Inc., which does business as Ballegeer Trucking, Inc. His father[2] Francis Ballegeer owns about 300 acres of farmland that border the Green River in Henry County, Illinois. This land includes the areas at issue in this lawsuit, which the parties referred to by agreement as Sites 1–5 throughout the course of the litigation.[3]

David Ballegeer grew up on the farm. Sometime in the 1970s, David and Franics Ballegeer built an earthen levee on the stretch of their property that adjoined the Green River, including all of the land in Sites 1–5. The levee was built to protect the property from the Green River when it flooded. In protecting the property from flooding, the levee also protected portions of the adjacent town of Colona.

At some point also in the 1970s, the Ballegeers added large slabs of concrete to the levee in order to protect it from erosion and to armor it against future flooding. Over the years, this concrete has included concrete taken from the operations of David Ballegeer's company. Photographs of the concrete on the levees, taken by Plaintiffs on trips down the river in 2013 and 2014, show that the levee immediately abuts the river, and consists in places of large concrete pipes, cinderblocks, and chunks of concrete many feet in size. Some of it also contains asphalt, bricks, and visibly protruding rebar. The concrete extends from the base of the levees themselves and into the bed of the Green River. Over the years, the Ballegeers have added to the levee, and repaired it as it has broken. Floods have both broken and washed away portions of the levee, and have overtopped it at times.

---

[2] The Court's Order granting summary judgment incorrectly referred to Francis Ballegeer as David Ballegeer's brother.
[3] An aerial photograph of the sites, with the sites marked on it, was attached to Plaintiffs' original notice of intent to sue, and is appended to this Order as Exhibit A.

Over the years, the Ballegeers have attempted to make sure that their levee complies with the law. They did so by, on several occasions, going to the local offices of the United States Army Corps of Engineers ("the Corps"), and speaking to a Corps employee, Donna Jones. According to Jones's trial testimony, Jones explained to them the permitting requirements of the Clean Water Act, and told them that if their levee fell within certain "nationwide permits," they would not have to proactively seek issuance from the Corps of a permit under the CWA.

Plaintiffs Quad Cities Waterkeeper, Inc. ("Waterkeeper") and Prairie Rivers Network ("PRN") are nonprofit organizations that monitor rivers and the environment in areas that include the stretch of the Green River at issue. Art Norris is the Executive Director of Waterkeeper. At some point in 2011, John Daggett, a local fishing enthusiast, contacted Norris in response to a newspaper ad asking for evidence of pollution in rivers. Daggett told Norris that he had seen concrete in the Green River adjacent to the Ballegeers' farm. In May 2011, the two went boating on the Green River to look. They saw the concrete in the river, through which they had to go slowly to avoid hitting the concrete with their boat. Daggett testified at trial that his enjoyment of the river was diminished by all of the concrete in it, because the concrete made it more difficult to go fishing, and diminished his overall aesthetic appreciation. Norris testified that his enjoyment of the river was also hindered by the concrete, which he felt had replaced the trees that sat on other portions of the riverbank.

On February 29, 2012, Waterkeeper sent a letter to Francis Ballegeer indicating that it intended to sue him under the CWA if he did not remove the levee concrete from the river, alleging that the concrete and associated materials were pollutants within the meaning of the CWA. On July 19, 2012, Waterkeeper filed the instant lawsuit against Defendants (PRN was added as a plaintiff later). In response to Waterkeeper's initial letter, the Ballegeers again spoke

to Jones to check whether their levee was legal under the CWA.  The Corps inspected the Ballageers' levee on March 7, 2012, and, by letter two days later, told them that their levee did not need a permit.  Nonetheless, in October 2012, David Ballegeer applied for a Section 404 permit under the CWA.  As part of their application process for this permit, which process continued while the instant litigation moved forward, the Ballegeers retained a consulting firm and drew up a detailed plan for completion of the proposed project, which contained responses to comments that had been solicited from the United States Fish and Wildlife Service, the City of Colona, and the legal representatives of Plaintiffs.  A representative of the Corps also walked along the riverbank that was the subject of the application and identified concrete with exposed rebar.  The Illinois Environmental Protection Agency also certified the permit.

The Corps granted the permit, effective December 8, 2014.  This permit, in evidence as Plaintiff's Exhibit 16 at QCWK-005447, authorized the Ballegeers to place riprap[4] along two portions of bank line on the Green River, corresponding to areas covering part of Site 4 and all of Site 5.  The permit contained specific requirements for the grade of the slope, which had to be re-graded to be less steep than it then was, and specified the kind of riprap material allowed to be used.  The material had to be concrete, and in pieces not greater than three feet across the longest flat surface.  Trees on the bank line had to be either protected with riprap or cut, if they were leaning into the river.  It further specified that if the levee was widened, it must be widened on its landward side.  Extra riparian vegetation was to be established by planting of live willow stakes and cuttings.  The permit expires on December 31, 2024.  The permit requires that the Ballegeers permit Corps officials to inspect the project at any time.  The permit also contains special conditions, including that the riprap used must consist of native fieldstone or clean quarry run rock or clean broken concrete.  If the latter is used, the permit requires that reinforcement

---

[4] Riprap is loose stone used to from a breakwater, levee, or other structure.

material shall be removed from the concrete or cut flush with its flat surface. The Ballegeers are assigned responsibility for making sure that reinforcement material that becomes exposed is removed.

Meanwhile, the litigation before this Court continued. In April 2014, both sides moved for summary judgment. *See* Defs.' Mot. Summ. J., ECF No. 36; Pls.' Mot. Partial Summ. J., ECF No. 61. On March 26, 2015, the Court ruled on the motions. Part of the Court's ruling on Defendants' motion included a determination, for purposes of summary judgment, that at least some of the material that Defendants had used to construct their levee could be pollutants and not excepted by the nationwide permits, as the Corps had told Defendants it was, because that material included concrete with protruding rebar and asphalt. Mar. 26, 2015 Order 22–27, ECF No. 88. Although framed as preserving the question of whether or not the material in question included protruding rebar and asphalt, the materials in question were, as determined later by the Court at trial and described herein, indeed and incontrovertibly asphalt and exposed rebar. This was contrary to the advice that had been offered by the Corps to the effect that the levee, as it stood, fell within a nationwide permit and did not need a Section 404 CWA permit. With little recourse left, Defendants argued in response to Plaintiffs' renewed motion for summary judgment, ECF No. 122, that their work on their levee over the years had fallen into a statutory maintenance exception. The Court disagreed, Sept. 29, 2016 Order, and granted summary judgment to Plaintiffs. A bench trial to determine remedy followed.

At trial, both parties called experts to testify. Plaintiffs' expert, Dr. Russell Dutnell, a fluvial geomorphologist, testified that the amount of concrete placed on the banks of the Green river was more than was necessary to achieve adequate bank stabilization. He also testified that the concrete had destroyed riparian plant buffers and removed the habitats of the animals that

lived there. He testified that the grass that had managed to grow on the Ballegeers' levee was sparse and not as diverse as what was able to grown on unleveed portions of river. Defendants' expert, Greg Wolterstorff, a civil engineer with a specialization in water resources, and who had prepared the outside consultant's report for the Ballegeer's permit application, testified that it would be impossible to construct a levee without disrupting riparian vegetation to some extent. He testified that there were bushes, trees, and grass along at least some portions of the Ballegeers' levee. He testified that the levee was stabilizing the bank of the river and preventing it from eroding under the forces of the Green River. He also testified that the amount of rock in the Ballegeers' levee was not excessive. In Wolterstoff's view, at least some of the concrete placed at the base of the levees, and in the river, constituted "toe," or base protection for the levee to prevent its erosion, and served a useful purpose to the survival of the levee.

Additionally of relevance to the Court's conclusions of law was the testimony of Robbin Ballegeer, who is David Ballegeer's wife, and who keeps track of finances for his company. She testified that the instant litigation and related costs have imposed a significant financial burden on Defendants, who have incurred more than $250,000 in attorney's fees, and have not yet been able to pay it all.

## CONCLUSIONS OF LAW

The Court previously found that Defendants' placement of concrete, rebar, dirt, and other pollutants on the banks and bed of the Green River below the ordinary high water mark had violated 33 U.S.C. § 1311(a), as alleged in the first two counts of Plaintiffs' amended complaint, and had not fallen within any exception to the CWA. Am. Compl. ¶¶ 53–62, ECF No. 5; Sept. 29, 2016 Order 3, 14–15. Since these were the only claims remaining, the Court granted

Plaintiffs' renewed motion for summary judgment, in its entirety. At the bench trial held to determine remedy, Plaintiffs sought the following relief:

(1) A declaratory judgment that Defendants "have violated and are continuing to violate the Clean Water Act by discharging concrete and other construction waste onto the banks of the Green River, a water of the United States, below the ordinary high water mark and onto the bed and bottom of the river, without a Clean Water Act Permit and without a valid exemption under the Act." Pls.' Trial Br. on Remedy 3, ECF No. 133. Plaintiffs also seek a declaratory judgment that they were the prevailing party. Pls. Post-Trial Br. 5, ECF No. 146.

(2) A civil penalty assessed against Defendants pursuant to 33 U.S.C. § 1319(d) in the amount of $100,000, but with $90,000 suspended, to be canceled if Defendants comply with the injunctive orders Plaintiffs also request. Pls.' Trial Br. on Remedy at 22–30.

(3) A permanent injunction against Defendants and their agents, assigns, and successors from discharging concrete and other construction debris below the ordinary high water mark of the Green River and on the bed and bottom of that river at the sites at issue in the Complaint without a CWA permit. *Id.* at 4–5.

(4) A restoration injunction requiring Defendants to remediate the violations of the CWA at the sites at issue in the litigation. Plaintiffs proposed three different general forms such an injunction might take: ordering removal of some or all of the concrete discharged onto the banks and bed of the river in violation of the CWA, Pls.' Post-Trial Br. 12–13; retaining a neutral expert to evaluate the sites and recommend a restoration plan, then ordering the plan or some version of it to be performed, *id.* at 14–16; crafting some other and more specific restoration plan, *id.* at 16–26.

(5) The Court's retention of jurisdiction over the matter pending satisfaction of the requested injunctions. *Id.* at 30–32.

The Court addresses each of Plaintiffs' requested forms of relief below.

## I. Declaratory Judgment

The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "In a sense, the Declaratory Judgment Act is relatively modest: it is a procedural innovation that does not expand the jurisdiction of the federal courts. It does not, and arguably could not, affect the underlying substantive state and federal laws that define the rights of the parties." *Med. Assur. Co. v. Hellman*, 610 F.3d 371, 377 (7th Cir. 2010). A district court's power to grant declaratory judgment is discretionary, rather than mandatory under given circumstances. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants.").

Plaintiffs' requested declaratory judgment as to Defendant's CWA violations amounts to a restatement, in the form of a judgment, of the reasons for which the Court granted summary judgment against Defendants on the first two counts of the Amended Complaint. The only thing the requested declaratory judgment adds is a determination that Defendants have not only violated the CWA in the past, but are continuing to violate it. Plaintiffs justify the request by observing that the Court has the power to issue declaratory judgments, and complaining that Defendants "continued [to] mischaracterize[e the] Court's liability findings at trial." Pls.' Post-

Trial Br. 4.  Plaintiffs further argue that such a judgment will serve "an educational purpose," *id.*, with respect to both Defendants and the Corps, which Plaintiffs view as having been unfairly friendly toward the Ballegeers in the past.

While the Court is cognizant that, in granting summary judgment, it did not specify which activities, during which span of time, violated the CWA, it proceeds to do so in these Conclusions of Law.  A declaratory judgment redoubling those statements would not serve a purpose consistent with the aims of the Declaratory Judgment Act, which exists primarily to "facilitate efficient outcomes," *Hellman*, 610 F.3d at 381, when sought by defendants or potential defendants to litigation in order to clarify their legal status expeditiously.  *See id.* at 377 ("The remedy made available by the Declaratory Judgment Act . . . relieves potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never. It permits actual controversies to be settled before they ripen into violations of law . . . ." (quoting 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2751 (3d ed. 1998)). Courts frequently deny requests for declaratory judgment in claims or counterclaims that simply duplicate or directly contradict a party's requested relief.  *See, e.g.*, *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 778 (N.D. Ill. 2008) (dismissing plaintiffs' claims for declaratory judgment where it "fail[ed] to add anything that will not be decided by the other pending counts."); *Lincoln Nat. Corp. v. Steadfast Ins. Co.*, No. 1:06CV00058, 2006 WL 1660591, at *4 (N.D. Ind. June 9, 2006) (dismissing counterclaim for declaratory judgment that only presented issues already raised in defendant's affirmative defenses).  Because Plaintiffs' requested declaratory judgment adds nothing that has not been decided by the Court's rulings, and serves no other useful purpose ("education" is insufficient, and the Court's instant Order will

be sufficiently educational in any event), the Court will not grant Plaintiffs' request for a

declaratory judgment. Furthermore, if Plaintiffs wish to argue for prevailing party status for the

purposes of a post-trial costs or fees motion, the place to do it is in such a motion.

## II.    Civil Penalties

> Any person who violates section 1311 . . . shall be subject to a civil penalty not to
> exceed $25,000 per day for each violation. In determining the amount of a civil
> penalty the court shall consider the seriousness of the violation or violations, the
> economic benefit (if any) resulting from the violation, any history of such
> violations, any good-faith efforts to comply with the applicable requirements, the
> economic impact of the penalty on the violator, and such other matters as justice
> may require.

33 U.S.C. § 1319(d). Plaintiffs observe that Defendants' violations appear to have been ongoing

for approximately 30 years, and ask that, of the theoretical maximum of many millions of dollars

in penalties the Court could assess, the Court instead order a penalty of $100,000, with 90% of it

to be suspended pending compliance with the Court's order, and canceled if the order is

complied with. Pls.' Post-Trial Br. 27–30. Defendants respond by acknowledging that some

penalty is mandatory, but asking that the Court exercise its discretion and order a penalty of

$4,750, "a figure which represents the administrative cost of a Section 404 permit application,

the Section 401 Water Quality Certification Fee, and the cost of Defendants' consultants, whom

[sic] were engaged to assist in responding to the Section 404 permit public comment period."

Defs.' Trial Br. 31, ECF No. 149.

Because section 1319 sets the civil penalty ceiling on the basis of days of violation, and

because the Court has not yet been clear on the matter, it is important to establish as an initial

matter for how long Defendants violated the CWA, and where on the Green River.

The CWA generally prohibits "the discharge of any pollutant" into federally protected

waters without a permit from the Corps. 33 U.S.C. §§ 1311(a), 1344(a). "The discharge of a

pollutant" is defined broadly to include "any addition of any pollutant to navigable waters[5] from any point source."[6]  *Id.* § 1362(12).  The CWA defines "pollutant" broadly to include not only traditional contaminants but also solids such as "dredged spoil, solid waste . . . biological materials . . . rock, sand . . . ."  *Id*. at § 1362(6).  Section 404 of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill materials into navigable waters, termed commonly and herein a Section 404 permit.  *Id.* at § 1344(a).  The Corps may proceed via a formal notice and comment process to designate specific sites for the discharge of dredged or fill material, *id.*, but is also authorized to issue via regulation "general permits," for which no application is necessary, and which categorically allow certain discharges of dredged or fill material that have "only minimal adverse environmental effects . . . ."  *Id.* at § 1344(e)(1).  The promulgation of the permits themselves requires notice and comment, but once issued, activities may fall within the ambit of the permit and be legal without further review or permitting by the Corps.  *Id.*; *see also United States v. Hummel*, No. 00 C 5184, 2003 WL 1845365, at *9 (N.D. Ill. Apr. 8, 2003).  These permits are commonly referred to as "nationwide permits."  *See, e.g.*, *Rueth v. U.S. E.P.A.*, 13 F.3d 227, 228–29 (7th Cir. 1993).  This is so even though they may be issued on a state, regional, or nationwide basis.  33 U.S.C. § 1344(e).

In the instant case, Defendants appear to have been under the impression for some time that their levee, while a "pollutant" within the meaning of 33 U.S.C. § 1362(6), fell within Illinois Nationwide Permit ("NWP") 13.  However, as the Court explained in its March 26, 2015 Order, this permit, which covers bank stabilization discharges, does not permit the discharge of asphalt or concrete with protruding rebar on streambanks.  NWP 13(2), Fact Sheet No. 7(IL) 7–

---

[5] "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).
[6] "Point source" is defined as "any discernible, confined and discrete conveyance."  33 U.S.C. § 1362(14).

8, U.S. Army Corps Of Engineers, Rock Island District; Mar. 26, 2015 Order 23. Thus, since Defendants did not seek a Section 404 permit for any of their levee until 2012, all of their levee that contained asphalt or protruding rebar fell outside the nationwide permit, and was an illegal discharge under section 1311.

It is difficult to determine, by a preponderance of the evidence, for what span of time Defendants violated the CWA in this way, and at which portions of the levee. Plaintiffs identified the section of the Ballegeer's riverbank at issue in their initial Complaint as being "a section of the Green River that starts approximately 3,000 feet upriver from the Green River's confluence with the Rock River and extends upriver from this point for approximately one mile." Compl. ¶ 33, ECF No. 1. The sites that the parties have argued over during the litigation correspond largely to locations where riverbed dredging was alleged to have occurred in the original letter sent to Francis Ballegeer and the initial Complaint. Dredging is no longer at issue in the case; thus, the sites either only incidentally refer to the areas of the river where the Ballegeers built their levee, or now refer to sites no longer at issue in the litigation in any way.[7] The evidence at trial shows that the Ballegeers have done levee construction work, over the years, on a span of bank starting at the bottom of Site 1, the area "approximately 3,000 feet upriver" from the Rock River confluence, and stretching to the top of Site 5, the region "approximately one mile" above. *Id.* The levee appears to stretch this entire length. The court determines that Defendants' violation of the CWA on this stretch of river was shown at trial by a preponderance of the evidence to have begun by May 2011, when Art Norris and John Daggett boated down it, and to have continued until the date of trial.

---

[7] This is the case with Site 6, where the Ballegeers had dug a channel that was the subject of a decades-earlier Corps CWA enforcement action. Site 6 does not contain a levee, and is thus not at issue here.

33 U.S.C. § 1319(d) provides a maximum penalty of $25,000 a day; thus, the maximum penalty the Court could apply would be on the order of $55.53 million. As both parties recognize, that figure is absurd, and even a much smaller one premised on a finding of liability stretching just a few weeks would be equally absurd in this case.

The Court turns to the factors section 1319 requires the Court to consider. The violations in question are not serious. While they were ongoing for a long period of time, the material being discharged was not obviously toxic or dangerous; indeed, it was largely the sort of material that is routinely and legally used as riprap to stabilize banks. No evidence was presented suggesting that the material used to build the levee was put there in disregard for whether it would end up in the stream; indeed, the evidence suggested that it was relatively laborious and difficult for the Ballegeers to shore up the levee with large pieces of concrete, and thus, that they had every interest in ensuring that they did so in such a way that the concrete would end up shoring up the levee rather than in the river. So too, the evidence suggested that the river was valuable to the Ballegeers, who had grown up swimming in it and who allowed the cows they kept to drink from it. All the evidence suggested no bad or reckless motive on Defendants' part, but rather, a desire to protect their land, and to some extent Colona, from flooding. While Plaintiffs argue that Defendants have a history of violating environmental laws, which ought, Plaintiffs argue, to count against Defendants under section 1319, Pls.' Post-Trial Br. 27–28, the instant violations were not in bad faith. Rather, the Ballegeers checked with the Corps on several occasions to assure themselves that they were in compliance with the CWA, and proactively sought a Section 404 permit for a portion of their levee after the initiation of this litigation, even though there had not yet been a finding adverse to them. So too, despite Plaintiffs' assertion, there was no showing of major financial gain to Defendants. No evidence was presented

showing that Defendants were dumping or disposing of material they knew to be harmful and knew would be costly to dispose of in another way; rather, the evidence was that the Ballegeers had access to the concrete and chose to use it to construct their levee because it was available. While it may be true that it would have been more costly to seek out and install CWA-compliant riprap from another source, it is difficult to construe this as an intentional effort on the Ballegeers' part to benefit by the use of cheap but noncompliant material since, as already observed, the Ballegeers had every reason to think that the material they were using was compliant. Any gain was accidental. Finally, and most significantly, the Ballegeers made a number of good-faith efforts to comply. In sum, the section 1319 factors weigh heavily in favor of a light or nominal imposition of fines.

The Court adds, under the section 1319 heading of "other such matters as justice may require," that insofar as civil penalties are meant to serve a deterrent purpose against potential like offenders under the CWA, a large penalty is not necessary to deter other nonindustrial rural landowners from building levees out of inappropriate material. Surely years of protracted litigation and hundreds of thousands of dollars in attorney's fees are amply sufficient to deter the farmer who might otherwise have considered using riprap with rebar in it to stabilize the banks of the stream running next to his land. So too, the need to deter the Ballegeers from future misbehavior is minimal, not least because they apparently possess only one stretch of river-edging property, and their future behavior with respect to that property will be entirely disposed of by this order. Future misbehavior will be deterred by this Court and by the Corps.

In light of these factors, the Court considers reasonable and appropriate Defendants' suggestion that they pay a civil penalty of $4,750, their estimate of the cost of applying for a Section 404 permit that they avoided with respect to the property still unpermitted. In so ruling,

the Court is adopting a "bottom-up," rather than "top-down" approaching, "begin[ning] with economic gain and add[ding] a sum to that figure guided by the other § 1319(d) factors and the need for punishment and deterrence." *United States v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, 806 (M.D. Pa. 1996), *aff'd*, 150 F.3d 259 (3d Cir. 1998).

## III.    Injunctive Relief

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). District courts are statutorily authorized to enter injunctions in citizen suit proceedings under the CWA. *See* 33 U.S.C. § 1365(a). However, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)). Instead, the CWA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act." *Weinberger*, 465 U.S. at 320.

Here, Plaintiffs have made a successful initial showing that they qualify for injunctive relief. Daggett and Norris, both members of plaintiff organizations, testified that their enjoyment of the river was harmed by the Ballegeer's levee, and not only by its features that would not be remedied by the use of CWA-compliant riprap and methods, but by its specifically violative

features.  They found the protruding rebar and other CWA-violative waste ugly, and testified that

it diminished their enjoyment of the river.  They also testified that they risked damaging their

boat on concrete that had been placed on or fallen into the river bed.  *See Amoco*, 480 U.S. at 545

("Environmental injury, by its nature, can seldom be adequately remedied by monetary damages

and is often permanent or at least of long duration, i.e., irreparable."); *see also Ohio Valley Envtl.*

*Coal., Inc. v. Hobet Min., LLC*, 723 F. Supp. 2d 886, 924 (S.D.W. Va. 2010) (finding irreparable

harm to plaintiff environmental organizations where defendant exceeded effluent limits).  By the

same reasoning, other remedies at law, such as monetary damages, are unlikely to remedy

plaintiffs' diminution in enjoyment.  Third, "[i]f [environmental] injury is sufficiently likely . . .

the balance of harms will usually favor issuance of an injunction to protect the environment."

*Amoco*, 480 U.S. at 545.  (A closer consideration of the balance of harms, however, requires a

consideration of what type of injunctive relief the Court will order, which will be discussed

below.)  Finally, the public interest would not be disserved by requiring Defendants to remediate

their violations of the CWA, or come into compliance with the CWA.  There is a clear public

interest in environmental protection.  *See Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692,

699–700 (D.C. Cir. 1974) ("[The citizen suit provision] reflects Congress's recognition that

citizens can be a useful instrument for detecting violations and bringing them to the attention of

the enforcement agencies and courts alike." (internal quotation marks omitted)).

Plaintiffs seek both a permanent injunction forbidding Defendants, apparently forever,

from discharging concrete or other construction debris anywhere in the Green river at the sites at

issue, Pls.' Trial Br. 4–5, Pls.' Post-Trial Br. 11, and an injunction requiring some sort of

immediate restoration or remediation of their discharges that violate the CWA, Pls.' Post-Trial

Br. 11–26.

The first request is easily disposed of. "Obey-the-law" injunctions are generally disfavored because they lack the specificity required by Rule 65(d). They are particularly disfavored where they are not narrowly tailored to the facts of the case. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 842–43 (7th Cir. 2013). While in some cases, ordering "immediate cessation," *Weinberger*, 456 U.S. at 320, may be appropriate injunctive relief, here it makes little sense. The Ballegeers are not in the process of issuing more waste in violation of the CWA; indeed, the evidence is that since 2012, they have been in at least the partial process of coming into compliance with the CWA. Ordering Defendants never to place CWA-violative material in the Green River would be both redundant with the order requiring them to come into compliance that all parties agree, at least notionally, is appropriate, and would be wildly overbroad in scope, both with respect to the persons enjoined, and the scope of time for which the actions in question are enjoined. Furthermore, Plaintiffs show no reason why, if Defendants are ordered to come into compliance with the CWA, the additional step of ordering them not ever to violate it is important, or represents any kind of marginal advantage. Plaintiffs' request for a permanent injunction is denied.

Plaintiffs lay out a number of expansive options for restorative injunctive relief, including an order that Defendants remove all concrete with protruding rebar from the river, that the Court appoint a neutral expert, or that the Court tailor some specific series of injunctive requirements to the facts of this case. Pls.' Post-Trial Br. 11–26. Defendants ask that, if the Court determines injunctive relief is appropriate, they simply be ordered to apply for an after-the-fact CWA Section 404 permit. Defs.' Post-Trial Br. 27–31. The Court is satisfied that the latter course— ordering Defendants to apply for an after-the-fact CWA permit—is appropriate, and sufficient to address Plaintiffs' harms.

The Court lacks the specialist knowledge to evaluate the laundry list of various requirements for restoration, replanting of vegetation, removing of all concrete blocks of a certain size or less, etc., etc., that Plaintiffs ask for.  More importantly, the many requests for injunctive relief do not correspond with the violation of the CWA that Plaintiffs have succeeded in showing:  that Defendants discharged rebar and asphalt into the Green River in the absence of any permission to do so as provided for in the CWA, either via a nationwide permit or a Section 404 permit.  While the members of Waterkeeper and PRN might be pleased were more trees to be planted, or studies of mussel populations taken, none of these proposed steps relate to remediation of the illegal action at issue here.  *See Nat. Res. Def. Council v. Metro. Water Reclamation Dist. of Greater Chicago*, 175 F. Supp. 3d 1041, 1063 (N.D. Ill. 2016) ("It is not the Court's task to wade into these murky waters to assign a permissible level of phosphorus above which the District is liable for violating the unnatural-growth standard.").

So too, the Court sees no purpose in appointing an independent expert to evaluate the state of the river and make recommendations that the Court would then decide (on what basis?) to enshrine in an injunction.  The harm before the Court is Defendants' violation of the CWA, and the obvious remedy, which injunctive relief can easily achieve, is that the Corps evaluate the state of Defendants' entire levee at issue in this litigation, insofar as it is not already permitted under Defendants' existing Section 404 permit, and determine whether or not a permit for Defendants' levee should issue.

Plaintiffs argue that because the Corps thought that the sections of Defendants' levee at issue in this litigation were covered by nationwide permits, asking the Corps to consider Defendants' application for a Section 404 permit will be a fruitless exercise.  Pls.' Post-Trial Br. 13.  But determining that a nationwide permit exempts a levee and evaluating that levee under

18

Section 404 are different procedures. In the latter case, the Corps must issue a public notice and solicit comment from the public, convey all of these comments to the applicant, consult federal regulations for environmental procedure, conduct an environmental assessment, and determine whether a permit should issue on the basis of a statement of findings. *See* 33 C.F.R. 325.2 (prescribing procedures); *id.* § 326.3 (allowing after-the-fact permit applications). Plaintiffs seem to worry that the Corps's friendliness toward Defendants will cause the Corps *not* to issue such a permit, but this makes no sense; such a non-issuance would result in Defendants' continued violation of the CWA, and exposure to further litigation on that basis. Pls.' Post-Trial Br. 13. There is every reason to think, in light of the procedure that was followed for Defendants' successful application for a Section 404 permit for part of their levee, that the Corps's review will be thorough, follow federal regulations, and cause the Corps and other stakeholders to bring to bear on the stretches of river at issue their particular institutional competence, which this Court lacks.

Such an injunctive remedy also satisfies the third prong of the *Monsanto* test, in that it is warranted "considering the balance of hardships between the plaintiff and defendant . . . ." *Monsanto*, 561 U.S. at 157. The hardships to Defendants are substantial but not insuperable, as demonstrated by their having already obtained a Section 404 permit for part of the land at issue. The hardships to Plaintiffs, among which would have to be the challenge of waiting for the Corps's permitting process to run its course, and the possibility of not seeing remediation of the riverbank as full or as thorough as they might desire, are real but not overwhelming. On balance, this is an appropriate solution. An injunction will issue, as enunciated below, requiring Defendants to apply for a CWA Section 404 permit within one month.

**IV.     Retention of Jurisdiction**

Finally, Plaintiffs request that the Court retain jurisdiction to enforce the terms of its injunction. The Court will do so. *See Blue Cross & Blue Shield Ass'n v. Am. Express Co.*, 467 F.3d 634, 636–37 (7th Cir. 2006) (explaining that a court can retain jurisdiction for purposes of enforcing an injunction that it issues at the close of litigation).

## CONCLUSION

Accordingly, the Court ORDERS defendants, jointly and severally, to pay a civil penalty of $4,750 pursuant to 33 U.S.C. § 1319(d).

Furthermore, in accordance with Federal Rule of Civil Procedure 65(d), the Court issues this INJUNCTION:

Because DAVID BALLEGEER and FRANCIS BALLEGEER have violated the Clean Water Act, 33 U.S.C. §§ 1251–1387, and in order to effect their compliance with the Act, the Court ORDERS DAVID BALLEGEER, FRANCIS BALLEGEER, or both, to apply to the United States Army Corps of Engineers for a permit under Section 404 of the Clean Water Act not later than April 26, 2017. The permit sought shall apply to the sections of the farm FRANCIS BALLEGEER owns on the Green River in Henry County, Illinois, more than 3,000 feet upriver from its confluence with the Rock River, but less than 8,280 feet upriver, upon which a levee has been built, and which have not already been granted a permit under Section 404 of the Clean Water Act. The Court retains jurisdiction until such time as DAVID or FRANCIS BALLEGEER apply for the permit, in order to enforce compliance with this INJUNCTION.

No further claims remaining, the Clerk is directed to enter judgment and close the case.


Entered this 28th day of March, 2017.

s/ Sara Darrow

_____

SARA DARROW
UNITED STATES DISTRICT JUDGE